262 F.2d 902
 ARLINGTON PARK JOCKEY CLUB, Inc., Plaintiff-Appellant.
v.
Ernest J. SAUBER, District Director of Internal Revenue, Defendant-Appellee,
WASHINGTON PARK JOCKEY CLUB, Inc., a corporation, Plaintiff-Appellant,
v.
Ernest J. SAUBER, District Director of Internal Revenue, Defendant-Appellee.
 No. 12453.
 No. 12454.
 United States Court of Appeals Seventh Circuit.
 February 2, 1959.
 
 Leo J. Schwartz, William J. Friedman, Arthur S. Freeman, Chicago, Ill., for appellants.
 Robert Tieken, U. S. Atty., Chicago, Ill., Charles K. Rice, Asst. Atty. Gen., Arthur I. Gould, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., Donald S. Lowitz, Asst. U. S. Atty., Chicago, Ill., for appellee.
 Before DUFFY, Chief Judge, and HASTINGS and KNOCH, Circuit Judges.
 DUFFY, Chief Judge.
 
 
 1
 Plaintiffs each brought a suit to recover corporate income taxes paid for the year 1948. The two cases were consolidated for trial. The question before us is whether plaintiffs may deduct as bad debts the sum of $227,225.71 which each advanced or loaned to a wholly-owned subsidiary in an unsuccessful effort to put the subsidiary on a self-sustaining business basis.
 
 
 2
 The Commissioner of Internal Revenue disallowed the deductions as bad debts and treated the amounts advanced as contributions to capital and, therefore, deductible only as long term capital losses. The decision of the District Court sustained the views of the Commissioner.
 
 
 3
 Plaintiffs are Illinois corporations engaged in operating race tracks in the suburbs of Chicago. In 1945, a professional football league known as the All America Football Conference was organized to compete with the then existing National Football League. The formation of the All America Conference immediately resulted in a bitter warfare between the old and the new leagues.
 
 
 4
 Southern California Sports, Inc. (hereinafter called "Southern California") acquired a franchise to operate a professional team in Los Angeles in the All America Football Conference. This team was known as the Los Angeles Dons. Mr. Benjamin F. Lindheimer, who has been an active and well-known figure in the sports world for many years, was the largest individual stockholder of Southern California. He was also chairman of the Executive Committee of the All America Football Conference. Mr. Lindheimer also was a stockholder and the executive director of each plaintiff.
 
 
 5
 Southern California sustained a loss in excess of $253,000 from the operation of its football team during the 1946 season. Notwithstanding such loss, Southern California made preparations to operate during the 1947 season. It spent $174,000 in pre-season expenses. The first game of the 1947 season was scheduled for Chicago on August 29, 1947. In the latter part of that month, Southern California offered to sell to plaintiffs its franchise, contracts, and other assets for the sum of $10,000.00. The purchaser was to receive on the date of the first scheduled game a trained team with all of the paraphernalia and equipment necessary to complete the 1947 season. Lindheimer believed that if the team played good football, a large attendance at the games would result and that the franchise might be worth between a million and a million and a half dollars.
 
 
 6
 Plaintiffs decided that instead of owning the team outright, they would create a new California corporation to be known as Los Angeles Dons, Inc. They believed that by operating the Dons as a California corporation, the club would be given local color and would receive greater support from Los Angeles area football fans. Don Ameche, who had been president of Southern California, became president of the Los Angeles Dons, Inc.
 
 
 7
 A special meeting of the board of directors of each plaintiff was held August 28, 1947. It was agreed the two corporations would jointly purchase the Los Angeles Dons for $10,000.00 and then transfer the team franchise and $20,000.00 to a new California corporation for which they would each receive one hundred shares of stock in that corporation. They also agreed to turn over $200,000.00 in cash, and in return, each plaintiff would receive an unsecured demand note of the California corporation for $100,000.00 bearing interest at 2½%. On the books of each plaintiff as well as on the books of the Los Angeles Dons, Inc., the $200,000.00 transaction was listed as a loan.
 
 
 8
 The minutes of the meeting of the respective boards of directors contained the following:
 
 
 9
 "It was further reported that if said offer [of the Southern California Sports, Inc. to sell the Los Angeles Dons] was favorably acted upon by Arlington Park and Washington Park, it would be necessary for each corporation to invest $10,000 as capital and to advance, in order to enable the corporation to function for the current season, an additional $100,000. Whether the 1947 season would result in a financial profit or loss depended to a great part on the success of the football team, and in considering whether such investment should be made, the directors should contemplate the possibility of an operating loss in 1947 of anywhere from $50,000 to $150,000. In such event, of course, the advances of $100,000 by each corporation could not be repaid at the end of the current season, but would depend on the future success of the team for ultimate liquidation."
 
 
 10
 The proposed transfer was carried through. The Los Angeles Dons, Inc. was organized under the laws of California, and the franchise was transferred to it. At the date of the transfer the Dons had an annual payroll of $332,586.92 for salaries to coaches, players and other necessary personnel. During the next fourteen months the Dons continued to operate at a loss. On March 5, 1948, plaintiff Washington Park advanced $100,000.00 and plaintiff Arlington did likewise making the payment in two installments of $50,000.00 on June 10, 1948 and September 8, 1948. No part of this $200,000.00 advance was evidenced by notes nor did it bear interest. However, it was carried on the books of plaintiffs and the Dons as loans.
 
 
 11
 By the middle of the 1948 season the Dons had used up all the funds theretofore received from plaintiffs. The directors of plaintiffs decided not to continue the football operation. Plaintiffs concluded not to permit the Dons to go into bankruptcy as it was believed sports writers and others would then blame plaintiffs for the resulting collapse of the All America Football Conference. They were unable to find a purchaser who would operate the team and assume all future liability on contracts of players and coaches.
 
 
 12
 On October 18, 1948, a partnership, formed by Lindheimer and members of his family, purchased from the Los Angeles Dons, Inc. for the sum of $39,970.25 the franchise and all other assets of Los Angeles Dons, Inc. exclusive of cash and certain accounts receivable. The Los Angeles Dons, Inc. agreed to pay and satisfy all current liabilities accruing prior to the date of sale. To meet these obligations, the taxpayers each advanced $25,000.00 to the Los Angeles Dons, Inc. on October 20, 1948, and an additional $2500.00 each on December 20, 1948. These advances were not evidenced by notes nor were they interest bearing. However, again, on the books of plaintiffs and the Los Angeles Dons, Inc., they were listed as loans. The Los Angeles Dons paid off all its liabilities other than the sums which had been advanced by plaintiff corporations, and was dissolved in December, 1948. On dissolution, each plaintiff received $274.29.
 
 
 13
 In its income tax return for the calendar year 1948, Washington Park deducted as a bad debt, the loss of $227,225.71 which it sustained in December, 1948, when the Los Angeles Dons, Inc. dissolved. Similarly, in its return for the fiscal year ending April 30, 1949, Arlington deducted as a bad debt the loss of $227,225.71 which it likewise sustained in December, 1948.
 
 
 14
 In determining whether the cash payments made by plaintiffs to the Los Angeles Dons, Inc. represented loans or additional capital investment, no single test can provide the answer. John Kelley Co. v. Commissioner, 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278; Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F.2d 182. The burden of establishing that the advances were loans is upon the taxpayers. New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172.
 
 
 15
 There were three series of advances from plaintiffs to the Los Angeles Dons, Inc. and they will be considered separately. The last advances of $27,500.00 each at a time when the Los Angeles Dons, Inc. was in a state of insolvency and was selling its assets to the Lindheimer group, clearly were not loans. There was no expectation by plaintiffs that same would be repaid. On oral argument plaintiffs' counsel, with commendable candor, admitted the determination of the District Court in this respect should not be reversed.
 
 
 16
 We next consider the advances of $100,000.00 made by plaintiff Washington Park on March 5, 1948, and the two payments by Arlington for $50,000.00 each on June 10, 1948 and September 8, 1948. By the time these advances were made, plaintiffs had had a full opportunity to appraise the disastrous results of the operation during the 1946 and 1947 football seasons. Future prospects must have looked dismal if not hopeless. No notes were given and no payment of interest was indicated. No showing was made that plaintiffs expected such payments to be repaid. True, the books of the plaintiffs and of the Los Angeles Dons, Inc. listed such payments as loans, but that was also the case of the $27,500.00 payments made at a time when Los Angeles Dons, Inc. was being liquidated. We hold taxpayers did not meet the burden resting upon them of establishing that these advances were loans.
 
 
 17
 A much closer question is presented as to the first transfer made on September 2, 1947 by each plaintiff of the sum of $100,000.00. At that time the officers of the plaintiffs were highly optimistic in spite of the heavy losses which the Dons had sustained in 1946. Lindheimer was suggesting the possible value of the Dons' franchise at from one to one and a half million dollars. Promissory notes were executed, payable on demand. An interest rate of 2½% was fixed. Although the minutes of the corporation authorizing the transaction make use of the term "investment", there is also mentioned the possibility that the "advances" could not be repaid at the end of the current season. These factors do give some support to the argument of plaintiffs that the first $100,000.00 advance by each of them was a loan.
 
 
 18
 However, the courts have laid down rather stringent tests to determine whether advances to closely held corporations may be treated as loans for tax purposes. This court said in Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F.2d 182, 186:
 
 
 19
 "* * * the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event."
 
 
 20
 In such cases, courts have stressed various factors such as the debt-equity ratio; the use to which the funds were put; whether outside investors would make such advances and lack of reasonable expectation of repayment. Gilbert v. Commissioner, 2 Cir., 248 F.2d 399, 406. The court in Gilbert also stated, at page 407: "While interest and profits are not always distinguishable, they are distinct concepts, and the distinction, however imperfect it may be in a particular case, lies in the degree of the risk involved. Thus, it would do violence to the congressional policy to permit an `interest' deduction where the `loan' is so risky that it can properly be regarded only as venture capital."
 
 
 21
 The District Court commented upon the honesty and integrity shown by Lindheimer in his testimony, but pointed out that he and other witnesses for plaintiffs all agreed that the entire sum of $475,000.00 advanced by plaintiffs was at the risk of the venture; that even the 2½% interest was not to be paid unless the Los Angeles Dons, Inc. was making a profit. The District Court properly gave weight to the circumstance that before Los Angeles Dons, Inc. was organized, Lindheimer had agreed with Admiral Jonas H. Ingram, who was then the Commissioner of All America Football Conference, that plaintiffs would pay all the business obligations of the Los Angeles Dons without regard to the fact that a separate California corporation would be formed to own the team. Thus, the plaintiffs, through Lindheimer, had committed themselves to place at the risk of the venture, and subordinate to the claims of creditors, all the funds needed to operate the team during the period the new corporation would own the franchise.
 
 
 22
 The advances made by each plaintiff to the wholly-owned subsidiary were in direct proportion to shareholder ownership. It has been held that this situation gives rise to a strong inference that the advances represent additional capital investment and not loans. Schnitzer v. Commissioner, 13 T.C. 43, affirmed 9 Cir., 183 F.2d 70.
 
 
 23
 Usually, in a debtor-creditor relationship, a fixed maturity date of the obligation is established, but this court and others have pointed out that under certain factual situations a fixed maturity date does not preclude an ambiguous situation from being construed as a capital investment rather than creating an indebtedness. Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., supra. In the situation before us no definite maturity date was designated.
 
 
 24
 We have concluded that the District Court was correct in holding that all of the advances made by plaintiffs to their wholly-owned subsidiary were capital contributions. It follows the judgment below must be and is
 
 
 25
 Affirmed.