**JAEGER AUTO FINANCE CO., a Corporation, Plaintiff,**

v.

**Emil J. NELSON, District Director of Internal Revenue, Defendant.**

**No. 58-C-304.**

United States District Court
E. D. Wisconsin.
March 14, 1961.

Carl R. Becker, Milwaukee, Wis., for plaintiff.

John T. Piper, Dept. of Justice, Washington, D. C., Edward G. Minor, U. S. Atty., Milwaukee, Wis., for defendant.

GRUBB, District Judge.

Plaintiff, Jaeger Auto Finance Co., is seeking a tax refund of $10,157.65, which sum represents additional taxes, plus interest, assessed against it for its fiscal years ended April 30, 1953 through April 30, 1956.

Plaintiff is an auto finance company incorporated in the State of Wisconsin on March 27, 1946. Its sole business was and is the financing of the automobile and truck sales made by the Jaeger Motor Car Company (hereafter referred to as "Sales Company"). At the time plaintiff was incorporated, it was authorized to issue 200 shares of $50 par value common stock, but it issued only 100 shares. When plaintiff commenced business, its capital totaled $5,000.

During the period involved in this suit, 85 per cent of plaintiff's issued stock was owned by Mr. Anthony Jaeger. The remaining 15 per cent was held by Mr. Jaeger's three daughters and two sons-in-law. Mr. Jaeger, who was also the controlling stockholder of the Sales Company, was president of the plaintiff corporation, although its actual operations were managed by its secretary, Harry E. Petrie, who was Mr. Jaeger's son-in-law.

Prior to plaintiff's incorporation, its promoters had conferred with officers of the Marshall & Ilsley Bank of Milwaukee, Wisconsin (hereafter referred to as the "Bank"). From these discussions evolved the method of operation which the plaintiff instituted when it began business. Under this plan, plaintiff purchased from the Sales Company the conditional sales contracts which the latter had entered into with its customers. In return for the conditional sales contracts, plaintiff paid the Sales Company the face amount of the contracts minus certain finance charges. Pursuant to a contract with the Bank, plaintiff then resold the contracts to the Bank for the face amount of each contract less the Bank's discount charge. Plaintiff's profit from these transactions was the difference between its interest rates, which were at least 6 per cent per annum, and the lower interest rates charged by the Bank, which amounted to approximately 4 per cent per annum. Under the contract between the plaintiff and the Bank, the maximum amount of conditional sales contracts which the Bank agreed to purchase and hold at any one time was $300,000.

Soon after plaintiff commenced operations, it was found that the agreement with the Bank and the consequent financial transactions had certain disadvantages. In particular, it was discovered that the Sales Company was losing some sales because potential buyers, many of them old customers, could not meet the Bank's credit requirements. The plaintiff, on the other hand, would have been willing to extend credit in those cases but for the lack of its own funds with which to do it. The Bank's default policy was also stricter than that de-

sired by the Sales Company. In order to remedy that situation, plaintiff sought to acquire cash from sources other than the Bank.

The result of that effort was that Mr. Petrie convinced the members of the Jaeger family to advance funds to the plaintiff in return for promissory notes payable upon sixty days' notice and bearing 4 per cent interest. Commencing in August, 1946, plaintiff began receiving funds from Mr. and Mrs. Jaeger and from their daughters and sons-in-law.

These advances were evidenced by promissory notes and were treated as loans on plaintiff's books. As of April 30, 1956, plaintiff was liable to the Jaeger family on notes totaling $210,115.32.

With the exception of two advancements in 1950 totaling $3,500, as of April 30, 1956, none of the advancements made by the Jaeger family since 1946 had been repaid by plaintiff.

In addition to the advancements made by the Jaeger family, the Sales Company advanced, without interest, a total of $50,000 in 1947, 1949, and 1950. This sum was repaid in 1952 and 1954. Also, two employees of the Sales Company advanced a total of $7,300 in 1948, 1949, 1953, and 1954 and took 4 per cent promissory notes in return. These advances were repaid by the plaintiff in 1957 and 1958.

Once plaintiff began receiving the loans manifested by the 4 per cent notes, it was able to retain a substantial portion of the conditional sales contracts sold to it by the Sales Company instead of reselling them to the Bank.[1]

In plaintiff's fiscal period, 1953 through 1956, its surplus increased from approximately $73,000 to $103,000. No dividends were declared during that period or at any time prior thereto.

Plaintiff timely filed a federal corporate income tax return for each of its fiscal years ended April 30, 1953 through April 30, 1956, and duly paid the tax liabilities reflected thereon. In computing its liability, plaintiff deducted, as interest paid, those amounts representing the 4 per cent return on the loans made to it by the members of the Jaeger family. In a post audit of plaintiff's income tax returns, the Commissioner assessed a total deficiency of tax and interest in the amount of $10,157.65 on the ground that the amounts paid by plaintiff to the Jaeger family were really distributions of dividends, not interest payments.

After payment of the deficiencies, plaintiff timely filed claims for refund. On April 23, 1958, plaintiff agreed to waive formal notification of the Commissioner's disallowance of said claims. Plaintiff was informally advised by letter dated July 3, 1958, that the claims had been rejected. Thereafter plaintiff instituted this action for refund of the deficiency payments made by it and for the statutory interest thereon.

■ The basic issue in this case is whether the cash payments received by the plaintiff from its stockholders were loans, as is claimed by the plaintiff, or whether such payments were in reality capital investments, as is argued by the Internal Revenue Service. The burden of establishing that the payments were loans rests on the plaintiff taxpayer. Arlington Park Jockey Club, Inc. v. Sauber, 7 Cir., 1959, 262 F.2d 902.

It must be noted at the outset that plaintiff is a special type of business corporation; namely, a finance company. The commodity in which plaintiff deals

1. As of April 30, 1953, plaintiff was holding conditional sales contracts amounting to $341,348.87; as of April 30, 1954, $276,127.50; as of April 30, 1955, $312,151.59; and as of April 30, 1956, $234,194.31. At the end of 1952, the Bank held contracts amounting to $9,874.38; at the end of 1953, $61,315.12; at the end of 1954, $34,594.65; at the end of 1955, $198,127.90; and at the end of 1956, $110,305.04.

is not machinery, clothing, or food—it is money. Some of the factors usually considered by courts in cases of this kind are not pertinent here. This latter point will be more evident as the problem is analyzed.

As noted, when plaintiff began its operations, its paid-in capital amounted to $5,000. This sum, as the evidence showed, was not intended to be used as working funds to acquire the conditional sales contracts. It was used to guarantee the payment of wages for a thirty to sixty day period and to acquire tangible assets, such as furniture, business machines, and office supplies.

At the outset, plaintiff was able to carry on its operations only because it borrowed funds from the Bank by rediscounting the conditional sales contracts which it received from the Sales Company. There is no doubt that the funds which plaintiff received from the Bank were loans. Plaintiff's initial mode of operation indicates an intention on its part to carry on its business through the use of borrowed funds. This is not unusual, for the money required by a finance company to purchase sound commercial paper secured by a lien on automotive equipment often is obtained through the medium of loans. Funds so obtained do not enter into the permanent capital structure of a finance company.

The Jaeger advancements served the same function as the Bank's loans. The only difference between the advances by the Bank and those by the Jaeger family was that the Bank actually received the conditional sales contracts from the plaintiff as security, whereas in the case of the Jaeger funds the contracts were retained by the plaintiff. The evidence showed that under an agreement between the plaintiff and the Jaeger family, the conditional sales contracts had to be retained by the plaintiff as security for the Jaeger advances. In fact, the total amount of contracts retained by the plaintiff always exceeded the total indebtedness to the Jaeger family, indicating that the plaintiff always adhered to its agreement with the Jaegers.[2] Consequently, in point of fact, the Jaeger advances were also secured by conditional sales contracts which, upon recordation, imposed a lien on each vehicle sold by the Sales Company.

The Jaeger family's advances were also secured by the fact that the conditional sales contracts which plaintiff received from the Sales Company were assigned with recourse against the latter company. In the years involved here, the net worth of the Sales Company was not less than $400,000.

Plaintiff always had sufficient funds on hand to immediately satisfy a demand for repayment of the Jaeger advances in the amount of $15,000 to $20,000. A demand in excess of this figure could have been met by refinancing with the Bank the conditional sales contracts which plaintiff had retained.[3]

In summary, the Jaeger family saw to it that their advancements were secured to such a degree that the risk involved in the transactions was a minimal one. In Gilbert v. Commissioner, 2 Cir.,

2. As of April 30, 1953, the total indebtedness of the plaintiff to the members of the Jaeger family amounted to $183,-632.79, and plaintiff retained conditional sales contracts totaling $341,348.87. As of April 30, 1954, the indebtedness equalled $195,081.63, and the retained contracts totaled $276,127.50. As of April 30, 1955, the indebtedness equalled $191,289.78, and the retained contracts totalled $276,127.50. As of April 30, 1956, the indebtedness equalled $210,-115.32, and the retained contracts totalled $234,194.31.

3. Because the plaintiff and the Bank had different accounting periods, it is not possible to compute whether the Bank could have refinanced an amount of contracts sufficient to cover all the Jaeger advances and still remain within the credit limit of $300,000. From the available figures, this would have been possible for the years 1953, 1954, and 1955. No accurate determination is possible for 1956.

1957, 248 F.2d 399, at page 407, the court said:

" * * * While interest and profits are not always distinguishable, they are distinct concepts, and the distinction, however imperfect it may be in a particular case, lies in the degree of risk involved. Thus, it would do violence to the congressional policy to permit an 'interest' deduction where the 'loan' is so risky that it can properly be regarded only as venture capital." [4]

In the court's opinion, the Jaeger funds were advanced with reasonable expectations of repayment. This fact strongly supports a finding that the Jaeger advances were loans.

A further factor inferring an intent by the parties to create a debtor-creditor relationship is the fact that all the formalities found in a loan situation were present in this case. Each advancement made to the plaintiff by the Jaeger family was evidenced by a promissory note bearing 4 per cent interest per year and payable within sixty days after demand. The advances were treated as loans on the plaintiff's books of account. Interest was paid regularly. The sums so received by the members of the Jaeger family were treated as interest in their respective income tax returns.

The substance and not the form of the advances determines whether they are to be considered as loans or as capital contributions. Crown Iron Works Co. v. Commissioner, 8 Cir., 1957, 245 F.2d 357, 358. In determining the substance of transactions such as these, nevertheless, the form of the advancements is one factor to be considered. Arlington Park Jockey Club, Inc. v. Sauber, 7 Cir., 1959, 262 F.2d 902, 905.

As mentioned, two employees of the Sales Company advanced a total of $8,300 to the plaintiff. That nonstockholders were willing to advance funds under the same circumstances as did the Jaegers also favors a finding that the Jaeger advances were loans, not additional risk capital.[5]

Plaintiff's acquisition of nonbank funds allowed it to engage in more flexible financing which inured directly to the benefit of the Sales Company, for the latter could thereby increase its sales. Plaintiff also profited from this arrangement, since each additional sale by the Sales Company resulted in an additional financing transaction by plaintiff, which in turn meant a greater profit. Plaintiff's acquisition of the Jaeger funds was not devoid of a business purpose. This, too, points toward a finding favorable to the taxpayer.

Finally, some of the factors found in cases where stockholder advances were held to be capital contributions are not present here. The advances by the members of the Jaeger family were not proportional to their stockholdings. There were no agreements not to enforce collection of the advances. The Jaeger advances were not subordinated to the loans of other creditors.

All the factors discussed up to now favor a finding that the Jaeger advances were loans. The only factor which detracts from such a finding is that the notes issued by the plaintiff were demand notes. Related to this last point is defendant's argument that plaintiff made no effort to repay a majority of the advances, stockholder and nonstockholder, until after the Internal Revenue Service initiated its audit. The foregoing, defendant argues, indicates that the shareholders did not intend to enforce payment of the notes.

Defendant's argument finds at the most only equivocal support in the record, for a total of $50,000 was repaid to the Sales Company prior to the tax audit, as well as $2,000 to the nonstockholding wife of Mr. Petrie. Also, prior to the audit, Mr. Petrie was repaid $1,500.

---

4. See also Arlington Park Jockey Club, Inc. v. Sauber, 7 Cir., 1959, 262 F.2d 902, 905, 906.

5. Arlington Park Jockey Club, Inc. v. Sauber, supra, at pages 905–906.

The factors supporting a finding that the Jaeger advances were loans far outweigh those detracting from such a finding.

The defendant also contends that plaintiff's capital structure is an example of "thin capitalization." It argues that $5,000 was sufficient capital at the time plaintiff commenced business, when the Bank was supplying the operational capital and rediscounting the conditional sales contracts, but that such amount was not sufficient when plaintiff expanded its business by purchasing and retaining the contracts.

Defendant's contention overlooks that plaintiff's mode of operation, as recommended originally by the Bank pursuant to its experience with other auto finance companies, was predicated on the use and rapid turnover of borrowed funds. In principle, the source of those funds was immaterial. According to the Bank's experience, plaintiff's paid-in capital did not have to be more than necessary to purchase office equipment and supplies and to guarantee salary payments up to about sixty days.

In the opinion of the court, the cases relating to the debt-equity ratio are not appropriate here where the very business is the profitable utilization of borrowed funds.

Under the facts of this case and considering the factors previously discussed, it is the court's opinion that the advances made to the plaintiff by the members of the Jaeger family were loans, not capital contributions.

The court hereby adopts the stipulations of fact filed by the parties as part of its findings of fact. Additional findings of fact are set forth in the foregoing opinion in compliance with Rule 52 of the Federal Rules of Civil Procedure, 28 U. S.C.A.

### Conclusions of Law.

1. *Bona fide* debts were created in each of the transactions reflected by the promissory notes of the taxpayer corporation to Anthony A. Jaeger and members of his family. They were not contributions to the capital of the taxpayer corporation. The monies paid by the taxpayer to Anthony A. Jaeger and members of his family as interest, and heretofore disallowed by the Commissioner, in the years involved, as interest, were in reality interest payments and not distributions of dividends. The disallowance of said interest as a deduction in each of said years by the Commissioner was erroneous.

2. Plaintiff is entitled to judgment for refund of said deficiency and interest in the amount of $10,157.65 together with interest thereon as provided by law from the date of payment thereof; namely, from September 18, 1957, to date of payment.

Counsel for plaintiff is directed to prepare an order for judgment and judgment in accordance with this opinion, submitting them to the defendant for approval as to form and the arithmetical computation of the interest only.