**CHARTER WIRE, INC., Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**Nos. 13695 and 13696.**

United States Court of Appeals Seventh Circuit.

Nov. 28, 1962.

Irving A. Puchner, Milwaukee, Wis., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Richard J. Heiman, Attorney, U. S. Department of Justice, Washington, D. C., James B. Brennan, U. S. Atty., Milwaukee, Wis., Lee A. Jackson, Harry Baum, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before SCHNACKENBERG, CASTLE and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This is an appeal from a judgment dismissing two consolidated actions by taxpayer, Charter Wire, Inc., for refunds of income tax for the years 1952 through 1955. During this period taxpayer paid to noteholders, who were also its sole shareholders, a total of $15,489.38 and deducted the payments as interest on its tax returns. The Commissioner of Internal Revenue determined that the payments represented dividend distributions rather than interest on "indebtedness" as contemplated by Section 23(b) of the Internal Revenue Code of 1939 [1] and Sec-

---

1. Internal Revenue Code of 1939:
   SEC. 23. DEDUCTIONS FROM GROSS INCOME.
   In computing net income there shall be allowed as deductions:

\* \* \* \* \*
   (b) Interest.—All interest paid or accrued within the taxable year on indebtedness, \* \* \*
\* \* \* \* \*

tion 163(a) of the Internal Revenue Code of 1954. The District Court, in dismissing the actions sustained the determination.

Taxpayer, a Wisconsin corporation, is engaged in the business of drawing and rolling wire. It was formed in 1946 to take over the assets and business of a partnership composed of Alfred W. Mellowes, Charles N. Mellowes, and William L. Scheller. At the time of incorporation, the partnership had a book value net worth of $66,805.74, and a going concern value of $240,000. The original capital of the partnership was $3,822.65. The average annual earnings of the partnership during the last five years of its existence were $62,476.29.

The partnership assets were transferred to the corporation in exchange for six per cent promissory notes in the amount of $66,805.74. The notes were issued to the former partners in the following proportions:

| | Amount of Note | Percentage Total |
|---|---|---|
| Alfred W. Mellowes | $29,473.12 | 44.1% |
| Charles N. Mellowes | 29,473.12 | 44.1% |
| William L. Scheller | 7,859.50 | 11.8% |
| Total | 66,805.74 | 100.0% |

In exchange for $680, one dollar par value stock was issued to the former partners in the following proportions:

| | Amount Contributed | Number of Shares Issued | Percentage of Total |
|---|---|---|---|
| Alfred W. Mellowes | $300.00 | 300 | 44.1% |
| Charles N. Mellowes | 300.00 | 300 | 44.1% |
| William L. Scheller | 80.00 | 80 | 11.8% |
| Total | 680.00 | 680 | 100.0% |

The stock included the good will value of the enterprise.

In 1950 and 1951 taxpayer recapitalized by issuing two classes of stock, one voting and one non-voting, in exchange for the original issue. The proportionate holdings of the three stockholders remained unchanged.

From March, 1947 to March, 1954 the stockholders subordinated their notes to obligations arising from corporate borrowing from the Marine National Exchange Bank of Milwaukee.

Interest has been regularly paid on the notes save for one three-month period during the latter part of 1947. In that year, the taxpayer's production was hampered by a six week strike. The strike occurred during a steel shortage. Taxpayer was unwilling to stop steel ship-

(26 U.S.C.1952 ed., Sec. 23.) Section 163(a), Internal Revenue Code of 1954 (26 U.S.C.1958 ed., Sec. 163), is substantially the same as the section set out above.

ments from its suppliers, although its plant was not operating, because it felt that any shipments delayed would never be delivered. To meet its trade obligations and because of a desire to maintain its record of discounting bills, and taking into consideration the tight cash position of the corporation, the directors voted to suspend payment of interest on the notes given in exchange for the partnership assets. Interest was suspended during October, November, and December, 1947. Back interest covering this period was paid in 1948.

Taxpayer in 1953 negotiated for the hiring of one J. Willard Marshall for an executive position. Marshall agreed to come with the corporation only if he could buy an interest in it. He was willing to invest up to $50,000 in corporate stock. The shareholders were reluctant to sell any of the stock but finally offered to sell Marshall 3,800 shares of common for $27,625.28. At the same meeting Charles N. Mellowes suggested Marshall loan the corporation $10,000. Marshall finally agreed to loan $7,427.23 at six per cent interest. He borrowed this money from a bank at three and three-fourths per cent interest. His "loan" bore the same ratio to the total amount represented by the stockholders' notes as his share of voting stock bore to the total voting stock then issued.

Pursuant to a resolution of the board of directors in February, 1954 the four notes of the stockholders (including Marshall's), which had a maturity date of January 31, 1956, were paid by corporate checks and the notes were cancelled. The checks were endorsed back to the corporation within two weeks and, in conformance with the resolution, new five per cent promissory notes were issued having a maturity date of January 31, 1960. The new notes eliminated the provision of the original notes which provided that they were to mature automatically on the death of the holder.

At all times the notes in question were carried as debt obligations on the books of the corporation.

■■ The burden of establishing that the advances were loans is upon the taxpayer. Arlington Park Jockey Club v. Sauber, 262 F.2d 902 (7th Cir., 1959). Even though the taxpayer has various explanations for each of its actions taken separately, the finding that the totality of facts indicates a risk-capital investment should not be set aside unless we are prepared to say that the District Court was clearly erroneous. Brake & Electric Sales Corp. v. United States, 287 F.2d 426 (1st Cir., 1961). A review of the undisputed facts and a reading of the clear, concise analysis of these facts contained in the opinion filed by the District Court convinces us that we would be making an unwarranted departure from the "clearly erroneous" doctrine were we to reverse the District Court's determination.

■ There is no doubt that the stockholders of taxpayer at all times held their notes in direct proportion to their equity ownership in the corporation. This raises a strong inference that the loans represented capital investment. Arlington Park Jockey Club v. Sauber, supra. The stockholders' subordination of their notes to the obligations held by the bank was properly considered by the District Court as bearing on the true nature of the transactions in question. P. M. Finance Corp. v. C. I. R., 302 F.2d 786 (3rd Cir., 1962).

The assets of the partnership exchanged for the notes of the corporation were found to be essential to the conduct of the taxpayer's business. This is another factor that may be used to weigh the balance in favor of the District Court's determination. Brake & Electric Sales Corp. v. United States, supra. In the latter case the absence of an unfavorable or disproportionate debt-equity ratio was not deemed controlling and the finding of an equity relationship was affirmed on the basis of other considerations. Taxpayer here argues strongly that it had an extremely favorable debt-equity ratio during the entire period in question and we can find nothing in the

record which would lead us to believe otherwise; however, we believe the many other factors present warrant an affirmance of the decision.

Expectation of payment at maturity is a good indication of the existence of a debt. This expectation, however, must be more than a theoretical one, and in retrospect if it can be shown that the stockholders making the advances were little concerned about the matter of payment of the principal when due, then the taxpayer's position is greatly weakened.

Here there was no evidence of a sinking fund having been established to provide for retirement of the notes at maturity—a fact given considerable weight in establishing the existence of a debtor-creditor relationship in Gloucester Ice & Cold Storage Co. v. C. I. R., 298 F.2d 183 (1st Cir., 1962). The record shows that the noteholders had complete control of the corporation and on several occasions exhibited their primary concern for their position as stockholders in preference to that of creditors. The stockholders subjugated their role as creditors when it was for the corporation's benefit. They called in the notes prior to maturity, issued new notes with a different maturity date, subordinated their notes without protest to that of a bank when asked to do so, and suspended payment of interest for one three-month period; thus they appear to have been little interested in their role as creditors. Their conduct as above related makes it apparent that they relied on their control as stockholders for security rather than on their status as creditors.

We further agree with the District Court in its analysis of the nature of the loans made to Marshall. The District Court noted:

"Especially damaging to the taxpayer's suggested interpretation of the facts of this case are the transactions with respect to the loan made to the corporation by Marshall. Upon the urging of Charles N. Mellowes that the funds supplied would aid in company expansion and that the loan would make him feel more like the other stockholders, Marshall, who was interested in only an equity investment, made the loan requested. To illustrate that this was not such a loan as would entitle taxpayer to a deduction for interest paid thereon, we note that the dominant purpose of the loan was not the need of the corporation for such funds, but *to assume harmonious relations with other stockholders*. It is abundantly clear that with its excellent credit rating, the corporation could have readily borrowed money from the banks, and probably at a more favorable rate than the 6% rate granted to Marshall. The fact that Marshall was able to borrow the money necessary to make the loan to the corporation at 3¾%, is consistent with this finding. After the consummation of the stock purchase and loan agreement, Marshall owned 10% of each class of stock and 10% of the outstanding notes owed to stockholders. This proportionality could be maintained as long as Marshall remained in the employ of the corporation since the corporation had an exclusive option to buy Marshall's stock in the event that he should desire to dispose of it during his lifetime, and if it exercised the option, the corporation was also obliged to purchase his note in the same proportionate amount. *The dealings with Marshall clearly indicate that the taxpayer and its shareholders treated the 'loans' as an integral portion of the contributed capital of the corporation.*" (Emphasis supplied.)

The judgment of the District Court is affirmed.