2554–58 CRESTON CORP., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 90544.   Filed September 10, 1963.

*Abraham H. Spilky*, for the petitioner.
*Richard B. Nashel*, for the respondent.

934

OPINION

RAUM, *Judge:* 1. *Alleged interest paid on the mortgage notes.*— Whether amounts designated as interest and paid by petitioner to its shareholders are deductible under section 163(a) of the Internal Revenue Code of 1954 [1] is essentially a question of fact upon which the taxpayer has the burden of proof. *Arlington Park Jockey Club* v. *Sauber*, 262 F. 2d 902, 905 (C.A. 7); *Charter Wire, Inc.* v. *United States*, 309 F. 2d 878, 880 (C.A. 7); *Matthiessen* v. *Commissioner*, 194 F. 2d 659, 661 (C.A. 2); *O. H. Kruse Grain & Milling Co.* v. *Commissioner*, 279 F. 2d 123, 125 (C.A. 9); *Sam Schnitzer*, 13 T.C. 43, 60, affirmed 183 F. 2d 70 (C.A. 9). We think the record convincingly shows that the cash received by petitioner from its shareholders represented in reality capital contributions rather than loans and hence the amounts paid by petitioner to its shareholders were not "interest" payments under section 163(a).

The instruments issued by petitioner were in proper form and had the outward appearance of what might be termed "classic debt." *Gilbert* v. *Commissioner*, 248 F. 2d 399, 402 (C.A. 2).[2] The record also indicates that petitioner timely made its "interest" payments to its shareholder-creditors. However, to state the above is only to pose the further and crucial question, namely, whether an "indebtedness" was in fact created for purposes of taxation within the meaning of the statute. *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39, 46–47 (C.A. 2); *Gilbert* v. *Commissioner, supra* at 402. As was pointed out in *Gilbert*, at page 403, the following language in *Bazley* v. *Commissioner*, 331 U.S. 737, 741, is applicable to the issue before us: "the form of a transaction as reflected by correct corporate accounting opens questions as to the proper application of a taxing statute; it does not close them."

It has often been recognized that "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event." *Commissioner* v. *Meridian & Thirteenth R. Co.*, 132 F. 2d 182, 186 (C.A. 7). Similarly, it was said in *Gilbert* v. *Commissioner, supra* at 406: "The significant factor [is] * * * whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business." Did Gass and his two associates in the present case intend to put their funds

---

[1] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

[2] The court in *Gilbert* v. *Commissioner*, 248 F. 2d 399, 402, stated:

"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof."

into the business, subject to its risks, to be recouped at a profit or loss like any other capital or equity investment, or did they contemplate repayment in any event regardless of the success of the venture? Stated somewhat differently, the "question is whether the characterization urged by the taxpayer accords with substantial economic reality." *Gilbert* v. *Commissioner, supra* at 406. It is on this basic question that petitioner must fail on the record before us, bearing in mind its burden of proof which was noted above.

Various criteria have been outlined from time to time as pertinent to the inquiry whether the alleged indebtedness is in fact one that satisfies the statute. See, e.g., *Arlington Park Jockey Club* v. *Sauber, supra* at 905–906; *Gilbert* v. *Commissioner, supra* at 406; *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39, 47 (C.A. 2). We set forth below some of those factors that lead us to the ultimate conclusion that the notes herein did not constitute "indebtedness."

In the first place, it is to be observed that the notes were held by the shareholders in proportion to their stock interests. Gass, who owned 50 percent of the stock, held one-half of the total face amount of the notes, and his two associates each owned 25 percent of the stock and face amount of the notes. As was said recently in *Charter Wire, Inc.* v. *United States*, 309 F. 2d 878, 880 (C.A. 7), the fact that the shareholders "held their notes in direct proportion to their equity ownership in the corporation * * * raises a strong inference that the loans represented capital investment." See also *Arlington Park Jockey Club* v. *Sauber, supra* at 906; *Wachovia Bank & Trust Co.* v. *United States*, 288 F. 2d 750, 756 (C.A. 4). Cf. *Gilbert* v. *Commissioner, supra* at 406. We by no means regard this element as conclusive, but it plays an important part in the context of the case as a whole.

A second element of significance is the adequacy of corporate capital, or the matter of "thin capitalization." Here, too, this factor, while not conclusive, may properly be taken into account. See *Montclair, Inc.* v. *Commissioner*, 318 F. 2d 38, 40 (C.A. 5); *Sam Schnitzer*, 13 T.C. 43, 60, affd. 183 F. 2d 70 (C.A. 9); *Isidor Dobkin*, 15 T.C. 31, 33–34, affd. 192 F. 2d 392 (C.A. 2); *Nassau Lens Co.* v. *Commissioner, supra* at 47. The importance of this factor was particularly recognized in *Gilbert* v. *Commissioner, supra* at 407:

> The relationship of "nominal stock investments" or "an obviously excessive debt structure," to use the phrases employed by the Supreme Court in John Kelley Co. v. Commissioner, 326 U.S. 521, 526, 66 S. Ct. 299, 302, 90 L. Ed. 278, to the degree of risk involved is clear. Any "loan" to the corporation in such circumstances would necessarily be venture capital in reality, for any business loss by the corporation would be reflected in an inability to repay the "loan."

In the present case we have a debt-equity ratio of 205 to 1. The corporation's sole business venture involved the acquisition of certain real property at a cost of $205,000. Yet its formal equity capital was $1,000, only slightly in excess of the $962.77 required for fees and closing charges at the time of acquisition. Plainly, its formal capitalization was wholly inadequate, unless it can be shown that it could have obtained similar loans from outsiders, a matter that will be considered below.

Petitioner's case in respect of inadequate capitalization is far weaker than that of the taxpayer in *Isidor Dobkin, supra*, which involved a somewhat comparable situation. There the corporation was organized to purchase an apartment building for approximately $72,000, subject to mortgages aggregating about $44,000. Cash in the amount of $28,000 was needed, and it was put up by those interested in the venture, designating $2,000 thereof as capital and the remaining $26,000 as debt. The resulting 35 to 1 ratio of indebtedness to capital stock was regarded as significant in reaching the conclusion in the context of that case that the stockholders intended to place at risk the entire cash that was paid in to the corporation.[3]

A third and highly significant factor is whether "outside investors" would have made any such advances or loans as are alleged to have been made here. See *Arlington Park Jockey Club* v. *Sauber, supra* at 905; *Gilbert* v. *Commissioner, supra* at 406, 407; *Nassau Lens Co.* v. *Commissioner, supra* at 47. We are convinced on this record that no outside investor would have made a $50,000 loan to petitioner, secured only by a third mortgage, payable in 10 years without provision for amortization, and bearing interest at the rate of 10 percent. Gass testified that he attempted to borrow the $50,000 on a third mortgage for the venture, but the best he was able to negotiate was a proposed loan bearing an effective rate of interest of "from 15 to 18 percent," which he subsequently admitted was "approximately 18 percent." This he found to be entirely unacceptable. Despite some fuzzy and unsatisfactory testimony given by another witness, indicating the possibility of better terms, we are fully convinced that petitioner could not have obtained a $50,000 loan from outsiders on the same terms that appear in the notes in issue. Not only is the 10 percent rate of interest substantially lower than the effective rate of approximately 18 percent that Gass found he would have to pay, but Gass' testimony left unresolved whether even that 18 percent loan could have been

---

[3] There is, of course, no magic formula fixing a precise ratio of debt to capital that will be determinative in any particular case. Compare *Leach Corporation*, 30 T.C. 563, with *Hoguet Real Estate Corporation*, 30 T.C. 580, both decided on the same day. Although *Leach* involved a substantially higher debt-to-capital ratio than *Hoguet*, we found that the advances in *Leach* constituted an indebtedness, whereas in *Hoguet* we found the advances to be risk capital. The final result must depend upon all of the factors considered together.

obtained for as long a period as 10 years or without provision for amortization.[4] The burden was upon petitioner and we will not assume facts in its favor that are unsupported by satisfying evidence.

We think that there was no intent to repay the amounts of the alleged loans herein in any event at maturity. To be sure, there was always the possibility that the property might be sold at a profit at some unascertainable future time that would permit repayment. But there was also the possibility of vacancies in petitioner's apartments and loss upon sale of the property that might preclude repayment. Petitioner's formal capital was so thin that the amounts of the purported loans were immediately subject to the hazards of the venture with no capital as a cushion for such loans. Petitioner's operations from 1951 until sale of the property in 1959 in fact resulted in net losses during some of the years and only nominal profits in the remaining years. The record also shows that petitioner had neither cash nor other liquid assets of sufficient magnitude with which to pay off the principal amounts of the notes, and that its cash position changed very little over the years, remaining always at a comparatively small amount. Petitioner's depreciation each year, a noncash expense, roughly approximated the net reduction of its prior mortgages, and it is reasonable to assume that, other things being equal, the value of the property would decline *pari passu* with the depreciation sustained. It seems all too clear to us that the most likely source for repayment would be merely the profitable liquidation of the venture at some unascertainable future date; but this is the very type of situation that reflects a capital investment rather than a true indebtedness.

When Gass was asked whether there was any intent to repay the notes while they were outstanding, he replied: "If we had enough money to pay it, we would pay it, yes." But it is plain that the possibility of repayment was highly conjectural. As already observed, petitioner did not in fact have funds with which to repay the notes in the absence of a profitable sale of the property accompanied by the receipt of sufficient cash. To be sure, there was the theoretical possibility that the notes might be paid off by refinancing the prior mortgages at a sufficiently high amount for that purpose. But this, too, was highly conjectural, and, notwithstanding some testimony in this connection by Gass on redirect examination after considerable prodding by petitioner's counsel, we cannot find that any such firm

---

[4] Compare *Charter Wire, Inc.* v. *United States,* 309 F. 2d 878, 881, indicating the relevance of a sinking fund for retirement of the notes at maturity.

Indeed, an 18-percent loan, even without provision for a sinking fund or amortization, would have required $4,000 in annual interest payments *in excess* of those called for in the notes before us. Petitioner would have been wholly unable to make such payments on this record.

intention was present when the notes were issued in 1951. Gass and his two associates controlled the corporation, and it was a matter of indifference to them whether the principal amounts were repaid at maturity. "They relied on their control as stockholders for security rather than on their status as creditors." *Charter Wire, Inc.* v. *United States, supra* at 881. Their principal objective was to make a success out of their venture, and if that meant holding the property until it could be sold at a suitable profit they were willing to do so regardless of any formal maturities appearing on the notes. They made an investment in that enterprise, not a loan to it. No outsider would have made any such loan to petitioner on the same terms, and we are convinced that the shareholder-noteholders did not expect repayment in any event at maturity. Their advances to petitioner were capital in nature.

The fact that interest was paid regularly, although of importance in other situations, loses much of its significance here. As in *Isidor Dobkin, supra* at 34, the "interest" was "derived principally from rental income of the property" and "payments could just as readily have been made as dividends had the original capital contributions been correctly designated." Cf. *Charter Wire, Inc.* v. *United States, supra* at 879–880.

We hold that the funds advanced by the shareholders to the corporation constituted equity capital, subject to the risks of the venture; there was no "indebtedness" within the meaning of section 163(a).

2. *Depreciation deduction.*—Petitioner claimed a depreciation deduction on its 1956 return in the amount of $5,217.72, which was allowed by the Commissioner. It now contends that the deduction should have been greater, because (a) the cost of the buildings was $181,556.18, rather than $156,531.71 which was the basis for computing depreciation on its return, and (b) the expectable useful life of the buildings at the time of acquisition in 1951 was 20 years, rather than 30 years, the expectable useful life used in computing depreciation on its return. This issue is purely factual and we received expert evidence from both sides.

(a) *Cost basis.*—A determination of the cost of the building involves an allocation of the total cost of the Creston properties, namely, $205,962.77, between its component parts, land and buildings. Each of the parties had an expert testify as to the relative values of the land and buildings. Petitioner's expert testified that 11.8 percent of the total cost of the Creston properties should be allocated to the land. On the other hand, the record shows that the city of New York, for real estate tax purposes, allocated 31.4 percent of its determination of the total value of the Creston properties

to land; and respondent's expert testified that the percentage rates as applied by the city to land and buildings were reasonable in general, and more specifically were reasonable in the instant situation.[5] On the basis of the evidence before us, we find that at least 24 percent of the total cost of the property should have been allocated to the land. Therefore, the cost basis of the building was not more than $156,531.71.

(b) *Useful life.*—The buildings were in excellent condition when purchased in 1951. They were located in one of the finest areas in the Bronx, and rentals increased during the years 1951–1959. Petitioner sold the property in 1959 at a price substantially in excess of cost. Petitioner's expert testified that the useful life of the buildings at the time of acquisition in 1951 was 18–23 years. Respondent's expert testified that their useful life was 30 years at the time of acquisition in 1951 and that the buildings' expected useful life at the time of trial was 25 years. On the basis of the evidence before us, we find that the useful life of the buildings at the time of acquisition in 1951 was not less than 30 years.

*Decision will be entered for the respondent.*

---

[5] Although valuations for real estate taxes may often be too low to be relied upon as furnishing the correct value of a particular parcel of real estate as a whole, we have no reason to reject the use of such valuations in determining the *relative* value of land and buildings.

