General Alloy Casting Company v. Commissioner.
General Alloy Casting Co. v. Commissioner
Docket No. 91381.
United States Tax Court
T.C. Memo 1964-148; 1964 Tax Ct. Memo LEXIS 187; 23 T.C.M. (CCH) 887; T.C.M. (RIA) 64148; May 28, 1964
*187 Payments on promissory demand notes issued by petitioner corporation to its shareholder-incorporators, held, not interest on indebtedness under sec. 163(a), Code of 1954, and, held further, not deductible from petitioner corporation's gross income. William W. Scott, Jr., 2900 Grant Bldg., Pittsburgh, Pa., and John E. Laughlin, Jr., for the petitioner. Lawrence L. Wilson, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax of petitioner for the fiscal year ended June 30, 1958, in the amount of $4,590.15. The issue presented for consideration is whether petitioner, for the fiscal year ended June 30, 1958, is entitled to a deduction under section *188 163(a), Code of 1954, for interest in the amount of $6,750. Petitioner conceded that respondent did not err in disallowing a deduction for bad debts in the amount of $2,077.22 for said fiscal year. Findings of Fact The stipulated facts are found accordingly and, together with the exhibits identified, are included herein by reference. General Alloy Casting Company, hereinafter sometimes referred to as petitioner, is a Pennsylvania corporation organized on May 23, 1957, under the name of Jandon, Inc., with an authorized capital stock of $25,000, consisting of 2,500 shares of common stock having a par value of $10 per share. Petitioner has its principal office at Rochester, Pennsylvania, and at all times since its incorporation has kept its books and filed its corporate income tax returns on the accrual method of accounting. Petitioner's corporate income tax return for the fiscal year ended June 30, 1958, was timely filed with the district director of internal revenue, Pittsburgh, Pennsylvania. Petitioner's business operations commenced as of June 1, 1957, and it is engaged in the manufacture, sale and reprocessing of interchangeable parts for ferrous and non-ferrous seamless *189 tube mills. At all times relevant herein Donald D. Wolff (hereinafter sometimes referred to as Wolff) served as president and chairman of the board of directors of petitioner corporation, and James H. Knowles (hereinafter sometimes referred to as Knowles) served as vice president, treasurer and a member of the board of directors of petitioner corporation. Prior to the incorporation of petitioner, Knowles and Wolff began negotiations with the owners of General Alloy Casting Company, a corporation, and the owners of General Trading Company, a partnership, for the purchase of the assets of the respective businesses. General Alloy Casting Company here referred to is not the petitioner herein and is in no way related to petitioner. On May 31, 1957, Knowles and Wolff entered into an agreement to purchase the assets of General Alloy Casting Company and General Trading Company. Knowles and Wolff had made exhaustive studies of these businesses prior to entering into the purchase agreement. The agreement provided that Knowles and Wolff would acquire all assets of the selling corporation and partnership, other than cash, accounts, notes, buildings, loans receivable, organization expense, *190 airplanes and automobiles, for the estimated purchase price of $370,002, consisting of the following specific estimated prices: (a) All the fixed assets
$300,000.00
(b) The plant expansion, real es-
tate and construction thereon
20,000.00
(c) All inventories
50,000.00
(d) All advertising supplies and all
plant and office records
1.00
(e) All other assets
1.00
Total
$370,002.00 The $370,002 estimated price was subject to final adjustment, particularly as to the value of the inventory, a statement of which was to be prepared under the supervision of a certified public accountant. The purchase agreement also provided that the buyers receive the right to use the name of General Alloy Casting Company and all good will connected therewith, that the sellers would not compete with the buyers in the same type of business for a period of 5 years, and that the buyers would accept payment for the sellers of accounts receivable for products manufactured and shipped prior to May 31, 1957. The purchase agreement was assigned by Knowles and Wolff to petitioner on June 3, 1957. Payment of the purchase price was to be made by delivering to the sellers $345,002 on the *191 date of execution of the agreement and reserving $25,000 as an adjustment reserve. On the final closing date of June 27, 1957, the sellers were to receive the balance of the purchase price as adjusted. The purchase agreement was consummated on June 6, 1957, when the sellers conveyed the assets to petitioner. The ultimate purchase price was $425,260.62, an increase of $55,258.62 over the estimated purchase price, computed as follows: Increase or
Estimated
Actual
(Decrease)
Fixed assets
$300,000.00
$289,761.66
($10,238.34)
Plant expansion, real estate
20,000.00
24,671.00
4,671.00
Inventories
50,000.00
110,411.84
60,411.84
Credit for 1957 real estate taxes
416.12
416.12
Other assets
2.00
(2.00)
$370,002.00
$425,260.62
$55,258.62
Petitioner paid the $425,260.62 as follows: Date
Amount
Payee
6/ 6/57
$ 20,000.00
General Trading Com-
pany
6/ 6/57
330,002.00
General Alloy Casting
Company
6/26/57
50,258.62
General Alloy Casting
Company
General Alloy Casting
Company
11/27/57
25,000.00
General Trading Com-
pany The $25,000 payment on November 27, 1957, represented the *192 adjustment reserve being held by petitioner. The total purchase price was allocated and entered on petitioner's books in the following manner: Inventory
$110,411.84
Land
22,000.00
Buildings
98,000.00
Equipment
182,761.66
Trucks
5,500.00
Building in construction
6,171.00
Prepaid taxes
416.12
Total
$425,260.62
A few months prior to the incorporation of petitioner, Knowles and Wolff contacted Hugh D. MacBain, vice president of Mellon National Bank and Trust Company of Pittsburgh, Pennsylvania, (hereinafter sometimes referred to as Mellon) with respect to a loan in connection with the purchase by Knowles and Wolff of General Alloy Casting Company and General Trading Company. Mellon was informed that Knowles and Wolff each expected to transfer $100,000 to petitioner, with $75,000 designated as a loan and $25,000 as equity capital. On June 3, 1957, a loan agreement was entered into between Mellon as lender, petitioner as borrower, and Knowles and Wolff as guarantors. Under the agreement Mellon agreed to lend $300,000 to petitioner, evidence by the latter's note bearing interest at the rate of 4 1/2 percent per year payable on the last day of each March, *193 June, September, and December, the first payment date being June 30, 1957. A principal payment of $60,000 was to be due on June 3, 1958, and subsequent installments of principal were payable at the rate of $15,000 at the end of each succeeding calendar quarter beginning September 30, 1958, and continuing until June 30, 1960, at which time the balance of principal, $120,000, was payable. Knowles and Wolff, as guarantors, unconditionally guaranteed the full and timely payment of the principal of the loan by petitioner, and each installment thereof, and the interest when due and payable. They also agreed that they would not claim or enforce, unless the principal and interest on the note shall have been paid in full, any right to be subrogated in whole or in part to any right or claim against petitioner. In addition, the loan agreement contained the following provisions: C. Negative Covenants of Borrower and Guarantors. Borrower and Guarantors covenant and agree that, until payment in full of the Note issued hereunder and interest thereon, without the prior written consent of the Bank, Borrower will not: 1. Permit the net current assets of the Borrower to be less in amount than *194 $60,000, all as determined in accordance with generally accepted accounting standards, provided, that in any case there shall be included in current liabilities the amount of each installment of principal of the Note which is payable within 12 months after the date upon which such determination is being made. 2. Permit the tangible net worth of the Borrower to become less in amount than $200,000, all as determined in accordance with generally accepted accounting standards, provided, that in any case in making any such determination there shall be deducted (i) all reserves for depreciation, amortization, obsolescence, insurance, accounts receivable and inventory valuation, (ii) the amount of any write-up in excess of cost of assets acquired, and (iii) any amounts at which goodwill, patents and patent rights, trademarks, trade names and copyrights and other intangibles are carried as assets. 3. Permit Borrower's inventories to exceed Borrower's net current assets determined as above provided. 4. Declare or pay any dividends (other than dividends payable in capital stock of the Borrower) on its outstanding capital stock, or purchase, redeem or retire, or make any distribution on, *195 any shares of its capital stock. 5. Create, assume or suffer to exist any mortgage (except as otherwise herein permitted), pledge, encumbrance or other lien on any assets of the Borrower now owned or hereafter acquired. 6. Create, incur, guarantee, endorse or assume any indebtedness for borrowed money other than the loan made pursuant hereto except indebtedness to the Guarantors (it being understood that each of the Guarantors has made a loan of $75,000 to the Borrower), now or hereafter existing, for moneys loaned or advanced to the Borrower (all such indebtedness to the Guarantor being hereinafter referred to as "Subordinated Debt"), and it is hereby agreed that all such Subordinated Debt, howsoever evidenced, shall be and remain subordinated and subject in right of payment to the prior payment in full of all indebtedness, whether for principal or interest, evidenced by the Note issued hereunder and all extensions or renewals thereof so that no payment of or on account of the principal of or interest on any Subordinated Debt shall be made or received, and neither of the Guarantors will endorse, sell, transfer, assign, pledge, hypothecate or encumber any evidence thereof, or take *196 or obtain any lien, pledge or security therefor, until all claims arising out or based upon the Note issued hereunder and any extension or renewal thereof shall have been paid in full, provided, that so long as the Borrower shall not default in the performance of any of its obligations under this Agreement or upon the Note, the Borrower may pay and the Guarantors may receive interest on Subordinated Debt at a rate not exceeding 4 1/2% per annum as and when the same shall become due and payable; and every evidence of Subordinated Debt shall bear a legend to the effect that it is subject to the foregoing provisions of this Agreement. * * *
11. Make capital expenditures on behalf of the Borrower in an aggregate amount in any fiscal year ending June 30 exceeding the amount of depreciation provided with respect to depreciable assets of Borrower for such fiscal year; provided, however, that in the fiscal year ending June 30, 1958, Borrower, without the consent of the Bank, may make capital expenditures in an amount in excess of such depreciation but not exceeding in the aggregate $80,000. * * *
The negative covenant No. 2 above was amended on December 20, 1957, to read: *197 Permit the tangible net worth of the Borrower, which will include subordinated notes payable of $150,000 to become less in amount than $200,000 * * *. This amendment was made to ease the restrictions placed on the borrower by the bank since the original figure was an arbitrary one and the circumstances warranted the change. For similar reasons the negative covenant limiting capital expenditures during the fiscal year ended June 30, 1958, to $80,000, was, by an amendment made on February 7, 1958, increased to $100,000. On June 6, 1957, $300,000 was made available to petitioner by Mellon pursuant to the loan agreement, and on the same day petitioner executed its note to Mellon for $300,000. The same day Knowles and Wolff each advanced $100,000 to petitioner. They each received 1,250 shares of petitioner's $10 par value stock, which comprised all of the authorized shares. [1] Also, Knowles and Wolff each received from petitioner identical 4 1/2 percent interest bearing demand notes, dated June 7, 1957, in the principal amount of $75,000. These notes were subject to the subordination provision of the loan agreement with Mellon. *198 The promissory notes read as follows: PROMISSORY NOTE $75,000 June 7, 1957 FOR VALUE RECEIVED, the undersigned, GENERAL ALLOY CASTING COMPANY, a Pennsylvania corporation, formerly named Jandon, Inc., hereby proises to pay to the order of [name of payee] at Pittsburgh, Pennsylvania, upon demand, the principal sum of Seventy-five Thousand Dollars ($75,000.00) with interest at the rate of 4 1/2 per cent per annum. PROVIDED, HOWEVER, that in accordance with the terms of the Loan Agreement of June 3, 1957, between Mellon National Bank and Trust Company and the undersigned (then named Jandon, Inc.), this Promissory Note is subordinate and subject in right of payment to the prior payment in full of all indebtedness, whether for principal or interest, evidenced by the Note issued under said Loan Agreement and all extensions and renewals of said Note, i.e., that no payment of or on account of the principal or interest of this Promissory Note shall be made and the said [name of payee] may not endorse, sell, transfer, assign, pledge, hypothecate or encumber this Promissory Note, nor take or obtain any lien, pledge or security herefor, until all claims arising out of or based upon *199 the Note issued under said Loan Agreement and any extension or renewal of said Note shall have been paid in full, EXCEPT THAT so long as the undersigned shall not be in default in the performance of its obligations under said Loan Agreement or upon the Note issued thereunder, the undersigned shall pay the interest upon this Promissory Note upon demand as hereinbefore provided. Subject to the terms of the foregoing provision, the undersigned hereby empowers the Prothonotary or any attorney of any court of record within the United States of America to appear for the undersigned and, with or without one or more declarations filed, confess a judgment or judgment against the undersigned in favor of the holder hereof as of any term of court for the unpaid balance hereof with costs of suit and an attorney's commission of 10% for collection, with release of all errors and without stay of execution, and inquisition and extension upon real estate is hereby waived and condemnation agreed to, and the exemption of all property from levy and sale on any execution thereof are also hereby expressly waived, and no benefit of exemption shall be claimed under or by virtue of any exemption law now in *200 force or which may hereafter be enacted. ATTEST: GENERAL ALLOY CASTING COMPANY
(s) James B. Hecht Secretary By: (s) Donald D. Wolff President The board of directors and shareholders of petitioner at a special meeting held on June 7, 1957, authorized and approved amendments to its Articles of Incorporation which changed the corporate name from Jandon, Inc., to General Alloy Casting Company and increased the authorized capital stock thereof to $50,000, divided into 5,000 shares of common stock having a par value of $10 per share. The Articles of Amendment were filed with and approved by the Department of State of the Commonwealth of Pennsylvania on June 18, 1957. Knowles and Wolff wanted to make a stock interest in the business available to members of their respective families either by sale or gift. To accomplish this purpose, they decided to keep the designated equity capital at a minimum amount. Accordingly, two corporations - Jandon, Inc., and the James H. Knowles Corporation - each with an authorized capital of $25,000 - were created to acquire and operate the business as a joint venture. Mellon objected to the use of two corporations so the acquisition and operation of *201 the business was accomplished through the medium of one corporation - petitioner. Knowles, on June 10, 1957, sold to his wife, Gretchen, 125 shares of petitioner's stock for $20 per share. On the same date, Wolff sold to his wife, Jane, 375 shares of stock of petitioner for $20 per share. On June 25, 1957, Knowles and Wolff and their respective wives entered into a voting trust agreement whereby each, as a depositing shareholder, was to transfer his stock in petitioner to voting trustees, Knowles and Wolff, who would then issue to each depositing shareholder voting trust certificates representing the number of shares deposited. The voting trust agreement is to run for a period of 10 years. The voting trust certificates provide that no voting rights pass to the owners of certificates. The purpose of the voting trust was to secure continuity of present management and existing policies of the corporation so that the company could continue without hindrance or without interference from the families of Knowles and Wolff. Pursuant to the voting trust agreement, Knowles received voting certificates for 875, 125 and 125 shares, respectively, and his wife, Gretchen, received a certificate *202 for 125 shares. Wolff received certificates for 375, 250 and 250 shares, respectively, and his wife, Jane, received a certificate for 375 shares. On October 14, 1957, Wolff made a gift to each of his minor children, Donald and Elizabeth, of a voting trust certificate representing 250 shares. The certificates received by the children were surrendered to the voting trustees and new certificates representing 250 shares were issued in the name of each child. Wolff reported such gift on his Federal gift tax return and valued the shares at $20 each. The following day, Knowles sold to each of two of his minor children, James and Albert, a voting trust certificate representing 125 shares for which they paid Knowles at the rate of $20 per share. On the same day Knowles' wife sold to their other minor son, William, a voting trust certificate for 125 shares, for which he paid her $20 per share. The certificates received by the Knowles' children were surrendered to the voting trustees and new certificates representing 125 shares each were issued in the name of each child. The children's own funds, which had been given to them over a period of time by their grandmother, were used to purchase *203 the shares. On November 1, 1957, petitioner declared a 100 percent stock dividend and 2,500 shares were issued to Knowles and Wolff, as voting trustees, who, in turn, then issued voting trust certificates in respective pro rata amounts to the existing holders of trust certificates. The stock dividend was to eliminate the $25,000 capital surplus created when $50,000 was paid into petitioner as equity capital by Knowles and Wolff on June 6, 1957, when its authorized capital was only $25,000. After petitioner declared the stock dividend, petitioner's stock was beneficially owned by the following individuals: Percentage
Name
Shares
of Total
James H. Knowles
1,750
35
James H. Knowles, Jr.
250
5
Albert P. Knowles
250
5
William S. Knowles
250
5
Donald D. Wolff
750
15
Jane S. Wolff
750
15
Donald D. Wolff, Jr.
500
10
Elizabeth J. Wolff
500
10
5,000
100
The balance sheet of petitioner as of June 30, 1957, is as follows: GENERAL ALLOY CASTING COMPANY
BALANCE SHEET
For Year Ended June 30, 1957
ASSETS
Current Assets
Cash in banks
$ 82,006.94
Accounts receivable
101,148.46
Inventory
87,423.90
Scrap
1,758.10
$272,337.40
Plant Property & Equipment
Land
$ 22,000.00
Building
$106,206.39
Equipment
182,761.66
Office Equipment
1,060.80
Trucks and Autos
9,139.06
$299,167.91
Less: Reserve for depreciation
2,923.32
296,244.59
318,244.59
Other Assets
Organization Expense
$ 793.46
Prepaid insurance
403.18
Prepaid taxes
416.12
$ 1,612.76
TOTAL ASSETS
$592,194.75
Liabilities and Capital
Current Liabilities
Accounts payable
$ 33,867.61
Notes payable - Mellon Bank
60,000.00
Escrow liability
25,000.00
Accrued payroll
8,341.66
Accrued taxes
8,733.28
$135,942.55
Deferred Liabilities
Notes payable - Mellon Bank
$300,000.00
Less: Current Payment above
60,000.00
$240,000.00
Note payable - Wolff
75,000.00
Note payable - Knowles
75,000.00
390,000.00
Capital and Surplus
Capital Stock
$ 50,000.00
Profit for period
16,252.20
66,252.20
TOTAL LIABILITIES AND CAPITAL
$592,194.75
*204 The balance sheet of petitioner as of June 30, 1958, is as follows: GENERAL ALLOY CASTING COMPANY
BALANCE SHEET
For Year Ended June 30, 1958
ASSETS
Current Assets
Cash in banks
$104,978.22
Accounts receivable
$ 41,544.52
Less: Reserve for bad debts
(2,077.22)
39,467.30
Inventory
32,207.76
Prepaid taxes
1,006.52
$177,659.80
Plant, Property & Equipment
Land
$ 22,000.00
Buildings & Equipment
$387,086.36
Less: Reserve for depreciation
46,460.92
340,625.44
362,625.44
Other Assets
Organization expense
$ 1,051.03
Prepaid expenses
3,200.00
4,251.03
TOTAL ASSETS
$544,536.27
Liabilities and Capital
Current Liabilities
Accounts payable
$ 35,266.83
Notes payable - Mellon within 1 year
60,000.00
Accrued interest
3,375.00
Accrued officers' salaries
9,000.00
Accrued payroll
5,330.92
Accrued taxes
15,894.21
$128,866.96
Deferred Liabilities
Notes payable - Mellon Bank
$240,000.00
Less: Current Payment above
60,000.00
$180,000.00
Note payable - Wolff
75,000.00
Note payable - Knowles
75,000.00
$330,000.00
Capital & Surplus
Capital Stock
$ 50,000.00
Earned surplus 7-1-57
$ 16,252.20
Income for year
19,417.11
Surplus 6-30-58
35,669.31
85,669.31
TOTAL LIABILITIES AND CAPITAL
$544,536.27
*205 During the fiscal year ended June 30, 1958, petitioner paid or accrued salaries to Knowles and Wolff in the amount of $28,750 each, or a total of $57,000. Between August and October 1957, petitioner purchased a safe cabinet, office furniture, 2 fork lift trucks and plant machinery totaling $28,123.74. The purchases ranged from a low of $730.68 for the safe cabinet to a high of $7,221.65 for a fork lift truck. From July 2, 1957, to June 6, 1958, petitioner paid $59,794.71 for construction of buildings and for the furnishing of materials in construction. Although Knowles and Wolff contemplated that improvements and renovations would be made, there was, at the time of petitioner's incorporation, no contract, requirement or commitment that any particular dollar amount of construction or improvements was to be made at any given time. As of June 30, 1960, another loan agreement was entered into between Mellon as lender and petitioner as borrower. At the same time petitioner executed its promissory note dated June 30, 1960, in favor of Mellon in the amount of $120,000. This loan was a refinancing of the $120,000 payment becoming due June 30, 1960, under the note dated June 6, 1957. This *206 loan agreement set forth provisions which were comparable to those of the previous loan agreement except that the subordination provision was changed to permit petitioner to make payments of principal and interest on its indebtedness to Knowles and Wolff, in any one fiscal year, in an amount not to exceed the amount due Mellon in such year on account of principal and interest. The personal guarantees of Knowles and Wolff were eliminated. The change in the subordination and guarantee provisions was a recognition by Mellon that the business was successful. The bank was willing to alter the subordination as the status of the corporation improved. Knowles and Wolff each received a promissory note dated June 3, 1960, in the amount of $75,000 from petitioner in substitution for the notes dated June 7, 1957, which were cancelled. The new notes were identical with the cancelled notes except that the provisions referring to the Mellon loan were changed to recite the terms of the amended subordination provisions. Petitioner is subject to the Pennsylvania Corporate Loans Tax of 4 mills on indebtedness to Pennsylvania residents. In its corporate loans tax reports filed with the Commonwealth *207 of Pennsylvania, petitioner reported $150,000 of indebtedness owed to Knowles and Wolff and paid the corporate loans tax with respect thereto. From and after the date Knowles and Wolff each advanced $75,000 to petitioner, such amounts have been reflected on petitioner's books, interim financial statements, annual audit reports and income tax returns as liabilities and petitioner has on its books consistently accrued an amount determined at the rate of 4 1/2 percent per annum as interest on such advances. Such amounts have always been paid every 6 months in accordance with the requirements of the notes given to Knowles and Wolff, who reported such receipts as interest income on their individual Federal income tax returns. During the year in controversy, petitioner paid as interest to Knowles and Wolff the following amounts: Amount
Date of Payment
Knowles
Wolff
Total
January 29, 1958
$1,687.50
$1,687.50
$3,375.00
June 7, 1958
1,687.50
1,687.50
3,375.00
$6,750.00
Opinion The only issue is whether the amounts designated as interest and paid by petitioner to Knowles and Wolff are deductible as interest under section 163(a)[2] of the Code *208 of 1954. Petitioner claims that the amounts paid to its shareholders, Knowles and Wolff, were payments of interest upon indebtedness resulting from advances of money to petitioner at the time it was organized. Respondent determined that such advances were not loans, but capital placed at the risk of petitioner's business. Respondent's determination is presumed to be correct and the burden of proof is upon petitioner to establish error in such determination. The considerations on which the courts rely in determining whether particular advances represent equity or debt have been stated often and are now familiar. The result of these considerations in a given case is determined upon the facts and circumstances of the particular case. We *209 have weighed and considered the facts and circumstances relating to the advances here in question and have concluded that they must be considered for tax purposes as representing capital rather than indebtedness. The language of section 163(a) is concise and clear. It allows a deduction for all interest paid or accrued on indebtedness. The section says nothing about the motive or purpose for incurring the indebtedness and paying the interest and makes no requirements with respect to the use to which the borrowed money is put. The Supreme Court, however, in Knetsch v. United States, 364 U.S. 361 (1960), and other courts in numerous cases, have indicated that the statutory allowance presupposes that the claimed indebtedness be not a sham or incurred in a sham transaction. This means that the term "interest" as used in the statute and as applied to the facts presented, must have reality. In other words, there must be some valid indebtedness requiring the payment of interest. We agree with the concept which has been recognized by the courts, at least since Gregory v. Helvering, 293 U.S. 465 (1935), *210 that a taxpayer has the right to decrease what would otherwise be his taxes by means which the law permits. But the Gregory case, as well as others, requires that the reduction be accomplished by means which the statute intended to provide. Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957). Thus, the determination of whether petitioner's claimed deduction falls within the ambit of the statutory provision requires that we look beyond the form in which the petitioner cast the transaction to see whether what was done was the thing which the statute intended to permit or allow. Gregory v. Commissioner, supra; Gilbert v. Commissioner, supra; R. M. Gunn, 25 T.C. 424 (1955) affd., 244 F. 2d 408 (C.A. 10, 1957). At the time Knowles and Wolff advanced money to petitioner a final price of approximately $425,250 had been established for the business assets of petitioner's predecessors. Prior to the close of petitioner's fiscal year ending June 30, 1958, $59,800 had been paid by petitioner for construction of buildings and furnishing of materials *211 in construction. Shortly after petitioner commenced operations it began purchasing equipment, and within the first 8 months in total of $28,000 was expended therefor. Petitioner had $500,000 available to start its operations. Before the end of its first full fiscal year of operation, approximately $513,000 was expended for the purchase of the assets of the predecessor businesses, plant construction, and equipment. In addition, the loan petitioner received from Mellon required a $60,000 principal payment on June 30, 1958, and, since no principal payment was to be made prior thereto, at least $13,500 in interest was also required to be paid by petitioner through June 30, 1958. In Charter Wire, Inc. v. United States, 309 F. 2d 878 (C.A. 7, 1962), certiorari denied 372 U.S. 965 (1963), and Brake & Elec. Sales Corp. v. United States, 287 F. 2d 426 (C.A. 1, 1961), the assets transferred to the corporations in exchange for debt were necessary for the conduct of the corporate businesses and comprised the assets of already existing businesses, thereby indicating permanent investments in the risk of the businesses. The only difference here is that *212 money advanced by shareholders-incorporators was used to purchase necessary assets. The conversion of the advances made by Knowles and Wolff into necessary assets for petitioner's operation indicates a permanent investment at the risk of the business, rather than temporary loans as contended by Knowles and Wolff. As we said in Isidor Dobkin, 15 T.C. 31 (1950), affd. 192 F. 2d 392 (C.A. 2, 1951), at p. 33: When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. * * * The testimony of Knowles made it clear that both he and Wolff expected repayment from anticipated earnings, thereby indicating the advances would be absorbed by petitioner's business needs. The division of their total advances into debt and acknowledged risk capital consequently was an arbitrary division. Such arbitrary designation is further *213 evidenced by their desire to keep the capital as low as possible so that Knowles and Wolff could transfer interests in petitioner to their families. This being so, the determination of the amounts to be designated as capital and debt had nothing to do with the business needs of petitioner. Such reason hardly qualifies as a business purpose, as argued by petitioner, since it is based on purely personal objectives without consideration for the financial needs of petitioner. We have recognized that claimed debt held in proportion to acknowledged risk capital is a factor to be considered in deciding whether stockholders' advances are, in reality, loans or risk capital. Wilbur Security Company, 31 T.C. 938 (1959), affd. 279 F. 2d 657 (C.A. 9, 1960); R. E. Nelson, 19 T.C. 575 (1952); Sam Schnitzer, 13 T.C. 43 (1949), affd. per curiam, 183 F. 2d 70 (C.A. 9, 1950), certiorari denied 340 U.S. 911 (1951); Edward G. Janeway, 2 T.C. 197, (1943), affd. 147 F. 2d 602 (C.A. 2, 1945); Isidor Dobkin, supra. *214 There is no basis for the argument that the alleged debts held by Knowles and Wolff were not in proportion to stockholdings merely because of the rearrangement of shares within the family groups. To do so would completely ignore reality and make distinctions here not warranted. Hoguet Real Estate Corporation, 30 T.C. 580 (1958). It is true that the two $75,000 notes payable to Knowles and Wolff were in demand form. As a practical matter, however, this is of no real significance in relation to petitioner's contention because both of the notes were subordinated to the bank's loan, and, in effect, could not be deemed to have a maturity date prior to that of the obligation to the bank. The subordination and deferment of the payments on the Knowles and Wolff notes is a factor indicating that the money advanced was risk capital and that no debtor-creditor relationship existed with respect thereto. The source of expectation of payment is also a factor to be considered in determining the issue of risk capital versus debtor-creditor relationship. Expectation of payment out of earnings *215 leads to an inference of intent to create risk capital. This view is further emphasized by the fact that there is no evidence of a sinking fund being established to provide for retirement of the notes. Charter Wire, Inc. v. United States, 309 F. 2d 878 (C.A. 7, 1962), certiorari denied 372 U.S. 965 (1963). That, as already stated, the subordination of the two notes to the indebtedness to the bank is likewise a factor pointing to risk capital appears to be without question. O. H. Kruse Grain & Milling Co. v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court; P. M. Finance Corporation v. Commissioner, 302 F. 2d 786 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court; Gooding Amusement Co., Inc., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957). Petitioner argues that courts have accorded substantial weight to the treatment and classification given shareholders' advances on the books and records of the parties involved. Petitioner relies on Maloney v. Spencer, 172 F. 2d 638 (C. *216 A. 9, 1949), and Edward Katzinger Co., 44 B.T.A. 533 (1941), in support of this contention. We do not question the fact that consistent treatment is a factor to be considered in favor of petitioner's position in this respect, but it is merely one of a number of factors to be considered on the record before us which lead to a contrary conclusion. See Sam Schnitzer, supra, page 60. Upon the basis of the foregoing discussion, and a careful review of the evidence, we are persuaded that the promissory notes in controversy represent equity capital and not bona fide indebtedness. By the same token, the payments here involved do not qualify as interest paid on indebtedness within the intendment of section 163(a) and the deductions thereof must be disallowed. Decision will be entered under Rule 50. Footnotes
1. Petitioner's authorized capital was $25,000, consisting of 2,500 shares of $10 par. Upon advancement of funds to petitioner by Knowles and Wolff $25,000 was allocated to capital surplus.↩
2. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. * * *↩