*Decisions will be entered under Rule 50.*

JOHN TOWN, INC., AN ILLINOIS CORPORATION, FORMERLY DANA PERFUMES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 362–63. Filed April 22, 1966.

*Howard G. Krane* and *J. B. Moore*, for the petitioner.
*Theodore W. Hirsh*, for the respondent.

PIERCE, *Judge:* The respondent, in his notice of deficiency herein, determined deficiencies in the income taxes of the petitioner for its fiscal years ended September 30, 1956, and September 30, 1957, in the amounts of $36,546.26 and $746,381.60, respectively; and he also disallowed a claim of petitioner for a refund of $191,491.61 for the latter taxable year ended September 30, 1957. The petitioner, in its petition herein, raised several issues respecting these actions of the respondent.

At the trial herein, the parties by written stipulation made various agreements and concessions respecting several of the issues raised by the pleadings—including a concession of petitioner that no refund is due to it by virtue of its above-mentioned claim for refund. All these agreements and concessions of the parties will hereafter be given effect in the computation to be made under Rule 50.

The result of the foregoing is: That as regards the taxable year ended September 30, 1956, all issues respecting that year have been eliminated from present consideration; and that as regards the taxable year ended September 30, 1957, only the two following issues remain open for decision:

(1) Is the petitioner entitled to exclude from its gross income under the nonrecognition-of-gain provision of section 337(a) of the 1954 Code, a substantial gain which it realized from sale of its operating assets during said taxable year ended September 30, 1957?

Decision of this issue will turn on: Whether certain purported "promissory notes" issued by petitioner at the time of its organization in 1947, and against payment of which it retained assets for more than 12 months after adoption in 1957 of a plan for its complete liquidation, evidenced a true bona fide indebtedness of petitioner; *or on the other hand*, whether said "promissory notes" actually represented in sub-

stance as distinguished from their form, equity capital invested at the risk of the business—so that petitioner's retention of assets to pay the same, for a period of more than 12 months after adoption of the plan for complete liquidation, violated the prohibition of section 1.337–2(b) of the Income Tax Regulations against retention of assets to meet a claim of stockholders for recovery of equity capital; and thereby deprived petitioner of the benefit of the nonrecognition-of-gain provision of said section 337(a).

(2) Is petitioner entitled to deduct for said taxable year ended September 30, 1957, depreciation or amortization in respect of a license agreement which it sold during said year for an amount in excess of the adjusted basis thereof as of the beginning of said year? Separate Findings of Fact and Opinions are hereafter set forth with respect to these two issues. All facts that have been stipulated are so found; and those portions of the stipulations of facts which pertain to a particular issue are incorporated by reference in the Findings of Fact for the issue to which they relate.

*Issue 1. Applicability of Nonrecognition-of-Gain Provision of Section 337(a)*

### FINDINGS OF FACT

The petitioner, John Town, Inc., is a corporation which was organized under the laws of the State of Illinois on October 1, 1947. Prior to July 1, 1957, its name was Dana Perfumes, Inc. The petitioner kept its books of account and filed its income tax returns in accordance with an accrual method of accounting and on the basis of fiscal years ended September 30. Its income tax return for each of the fiscal years here involved was filed with the district director of internal revenue at Chicago.

### Background Facts

For several years prior to November 7, 1940, a Spanish individual named Javier Serra, and a New York corporation named Les Parfumes de Dana, Inc., in which Serra was a principal stockholder, were the owners of the trade name Tabu under which they marketed in various parts of the world perfumes, colognes, and cosmetics that had a distinctive scent name Dana which Serra had created. Also during this same period, an American citizen named J. L. Younghusband and an Illinois corporation named Associated Distributors, Inc., in which Younghusband was the controlling stockholder, were the owners of a similar trade name Tabu under which they marketed, in the United States and elsewhere, various cosmetics and toilet preparations which did not embody the distinctive Dana scent above mentioned. In this circumstance all the above-mentioned parties,

on November 7, 1940, entered into a written license agreement (hereinafter sometimes called the Dana license), under which Serra and his New York corporation granted an exclusive license to Younghusband and his Illinois corporation, to use for a period of 20 years from the date of such agreement, both the licensors' distinctive Dana scent and also their trade name Tabu, for use in marketing perfumes and cosmetics throughout the United States and in certain other designated areas. Under the terms of this license, the licensors agreed to supply the licensees with the oils for said distinctive Dana scent; and the licensees agreed, not only to pay the licensors a royalty equal to 11 percent of their net sales of Dana products, but also to expend in the advertising of said products, approximately 25 percent of their net sales. The license agreement provided that it could be assigned by the licensees to a corporation organized to take over the license; and that in such event the initial licensees would be released from further responsibility, "except insofar as this agreement relates to the active interest of J. L. Younghusband in respect to the distribution and sale of the products covered by this agreement."

Shortly after the execution of this license agreement, the above-named initial licensees did, on November 26, 1940, assign the same to an Indiana corporation named Dana Perfumes, Inc. (hereinafter called Dana (Indiana)), which had been newly organized about 3 days previously. This corporation, immediately after its organization, had 800 shares of common stock outstanding, of which 550 were owned by the above-mentioned J. L. Younghusband. Subsequently on October 21, 1946, following certain transfers of the corporation's stock, and continuously thereafter until September 29, 1947, all the outstanding shares of said Dana (Indiana) were held as follows:

| Stockholder | Number of shares |
|---|---|
| J. L. Younghusband | 637½ |
| Paul Rowatt | 112½ |
| J. L. Montenier | 50 |
| Total | 800 |

Paul Rowatt, above mentioned, had become associated with Younghusband in 1941 as a member of a partnership named Consolidated Cosmetics. This partnership had at about that time become the successor to Younghusband's above-mentioned corporation named Associated Distributors, Inc.; and also it had been substituted for the above-mentioned corporation as the sole distributor of the Tabu products of Dana (Indiana). Thereafter said Consolidated Cosmetics partnership was the vehicle through which Younghusband carried on the promotion, distribution, and sale of cosmetics.

During the period from November 26, 1940, through September 30, 1947, Dana (Indiana) operated under the above-mentioned Dana license agreement; and it was very successful in its operations. Acting through the above-mentioned Consolidated Cosmetics partnership, it sold throughout said period the Tabu line of colognes and perfumes at high prices, through leading department stores and women's specialty shops and also through leading drugstores, in many cities of the United States.

### *Facts re Organization of Petitioner Corporation*

In about 1947, J. L. Younghusband, who was the controlling stockholder of Dana (Indiana) and also the president, treasurer, and one of the directors thereof, expressed to Paul Rowatt (the second largest shareholder) a desire to dispose of his interest in Dana (Indiana). Rowatt indicated that he would be willing to cooperate in Younghusband's attainment of such objective if some satisfactory arrangement could be made. Rowatt then suggested that, in his opinion, the Dana (Indiana) business as a whole was worth about $8 million.

Shortly thereafter, following further discussion of this matter, Younghusband and Rowatt decided that the most likely purchaser of the Dana (Indiana) business would be the above-mentioned Javier Serra who, as before stated, was one of the licensors under the Dana license. Accordingly, Rowatt talked with representatives of Serra in New York; and following this, he and one of such representatives went to France to confer with Serra personally. The result of this conference was that, although Serra indicated that he would like to acquire the Dana (Indiana) business, the suggested $8 million purchase price was more than he could handle at that time; and accordingly no sale of the business to him was effected.

Subsequently, after Rowatt had returned to the United States and told Younghusband of Serra's attitude, Younghusband expressed the view that said $8 million suggested sale price for the Dana (Indiana) business was too high, and that a more realistic price for the business as a whole would be from $5 to $5½ million.[1] Rowatt thereupon told Younghusband that he (Rowatt) personally was very much interested in the Dana (Indiana) business, because he had been active therein for a long time and had made a study of it; and that if Younghusband was serious about his expressed willingness to sell his interest in the business on the basis of the business being worth from $5 to $5½

---

[1] There is no evidence that any formal appraisal was ever made of the going business of Dana (Indiana) as a whole, or of the Dana license agreement, or of any other asset of said corporation.

There are indications in the record that the *cost basis* of the Dana license on the books of the Indiana corporation (being the amount available for its amortization of this principal asset) was only some $32,000 or $36,000. [Tr. 14; Exh. 109, Sched. 1–H.]

million, maybe a deal might be worked out under which he (Rowatt) would take over Dana (Indiana).

Rowatt's initial plan was that he would organize a new corporation, and then have *it* purchase *the assets* of Dana (Indiana). This plan however was unacceptable to Younghusband, for he realized that it would result in a double income tax burden—that the selling corporation would first have to pay tax on whatever gain it might realize from the sale of its assets; and then the stockholders would have to pay another tax on any gain they might realize from the corporation's distribution of a liquidating dividend to them. Thereupon following further discussions, a revised plan was worked out, under which: (1) Rowatt agreed that he personally would purchase from Younghusband and Montenier on terms acceptable to them, all of their shares of stock in Dana (Indiana) so that he would then become the sole stockholder of that corporation; (2) that he (Rowatt) would then completely liquidate the Indiana corporation, so as to cause him to become the individual owner of all of said corporation's going business and assets, including the Dana license; and (3) that immediately thereafter, he (Rowatt) would personally transfer all of the same to a newly organized Illinois corporation (the petitioner herein) of which he personally would then be the sole stockholder. This plan was acceptable by all parties concerned; and it was made effective in the following manner.

It was first agreed that the price for which Younghusband and Montenier would sell and transfer to Rowatt all their shares of stock in Dana (Indiana) would be based on a total value of $5,200,000 for the entire going business of said Indiana corporation, representing $5,100,000 for the intangibles (consisting principally of the Dana license) and $100,000 for all net tangible assets which the corporation held at that time.

Next on September 29, 1947, Rowatt concurrently entered into two substantially identical written agreements (one with Younghusband and the other with Montenier) under which Rowatt agreed to buy, and said other stockholders agreed to sell him, all their shares of stock in Dana (Indiana) on the basis of the above agreed total value of $5,200,000 for the entire going business of said corporation. The first of these two agreements, which is the one between Rowatt and Younghusband, read as follows:

THIS IS AN AGREEMENT made, for value received, whereby PAUL ROWATT buys and J. L. YOUNGHUSBAND sells, 637½ shares of the capital stock of Dana Perfumes, Inc., an Indiana corporation, for a price of $4,143,750.00, payable as follows:

(a) $63,750.00 simultaneously with the execution and delivery of this agreement, receipt of which is hereby acknowledged;

(b) $60,562.50 on December 15, 1947, with interest after the date hereof at 2% per annum on the balance of the purchase price then remaining unpaid;

(c) The balance of $4,019,437.50 in thirteen (13) installments of $309,187.50 each on December 15 of every year beginning in 1948 and ending in 1960, with interest at 2% per annum after the date hereof, payable annually on the principal balance of the purchase price remaining from time to time unpaid.

Younghusband agrees that the financial condition of Dana Perfumes, Inc., an Indiana corporation, is as shown by the books of account of said corporation and that he knows of no liabilities of said corporation which are not reflected by said books of account. In the event liabilities unknown to Younghusband and Rowatt as of the date hereof are claimed and collected against Dana Perfumes, Inc., an Indiana corporation, or its successors or assigns, then Younghusband agrees he will protect and save Rowatt harmless from the loss and expense suffered by Dana Perfumes, Inc., and its successors and assigns, to the extent of 79.68% of the loss and expense lawfully incurred and paid to discharge such unknown liabilities.

Rowatt hereby acknowledges receipt from Younghusband of said 637½ shares of the capital stock of Dana Perfumes, Inc., an Indiana corporation, which *Rowatt hereby deposits with Younghusband as collateral security for the payment of the purchase price described herein*, with full power and authority to Younghusband to sell and assign and deliver the whole of said property, or any part thereof, or any substitute therefor, or any additions thereto, at any broker's board or at public or private sale, at Younghusband's option, and with the right to be purchaser himself, at such broker's board or public sale, on the nonperformance by Rowatt of his obligations hereunder, or the non-payment on the dates specified in paragraphs (b) and (c) hereof of any of the purchase price described herein, or at any time or times thereafter, without advertisement or notice; and after deducting the legal costs and expenses for collection, sale and delivery, the residue of the proceeds of such sale or sales so to be made shall be applied to pay any unpaid portion of the purchase price described herein, whether or not then due according to the provisions of this agreement, any overplus to be returned to Rowatt, who shall remain liable for any deficiency arising on account of such sale.

Dated at Chicago, Illinois, September 29, 1947.

(S)  J. L. Younghusband
J. L. YOUNGHUSBAND
(S)  Paul Rowatt
PAUL ROWATT

[Emphasis supplied.]

The other concurrently executed agreement, being the one between Rowatt and Montenier, contained provisions which were substantially identical with those above quoted, except that Montenier therein sold to Rowatt the 50 shares of Dana (Indiana) which he owned for the total price of $325,000, payable as follows: $5,000 simultaneously with the execution of the agreement; $4,750 on December 15, 1947; and the balance of $315,250 in 13 installments of $24,250 each. And also therein, Montenier agreed to indemnify Rowatt for 6.25 percent of any additional costs, expenses, or liabilities not shown on the books of Dana (Indiana).

Each of these two agreements was given effect; and Rowatt paid Younghusband and Montenier the initial amounts of $63,750 and $5,000 called for in the respective agreements. Each of these payments was

effected by delivery of a check drawn by Rowatt on his personal account at the Northern Trust Co. of Chicago, Ill. The larger check to Younghusband was certified by said bank. And these checks were thereafter deposited to the credit of Younghusband and Montenier, respectively, in their personal accounts at the National Boulevard Bank of Chicago. Younghusband and Montenier thereupon delivered to Rowatt the certificates representing all their respective shares in Dana (Indiana). On this same day, said shares of stock were transferred of record to Rowatt on the books of Dana (Indiana); and a new certificate to evidence the shares so purchased was issued and delivered to Rowatt. The result was that Rowatt thereupon became the record owner of all 800 shares of the outstanding capital stock of Dana (Indiana). Further, on this same date of September 29, 1947, Rowatt deposited all the shares which he had so acquired, with Younghusband and Montenier, respectively, as collateral security for the deferred payments owing by him to them under the two above-mentioned stock purchase agreements.

On the following day of September 30, 1947, Younghusband and Montenier returned to Rowatt, in accordance with separate trust receipts which Rowatt executed and delivered to them, all the shares of Dana (Indiana) which they were then holding as collateral security for Rowatt's obligations under the above-mentioned stock purchase agreements. The trust receipt so delivered to Younghusband read as follows:

### TRUST RECEIPT

This instrument acknowledges that the undersigned has received from J. L. Younghusband, in trust, 637½ shares of the capital stock of Dana Perfumes, Inc., an Indiana corporation, and in consideration thereof, it is understood the undersigned may and will:

(a) Cancel and surrender said shares on the dissolution of Dana Perfumes, Inc., an Indiana corporation;

(b) Cause a new corporation to be organized under the laws of Illinois to acquire the property of said Indiana corporation and operate, solely for the account of said Illinois corporation, the business enterprise known as the sale and distribution of Dana products in the United States of America and wherever else it is licensed so to do,

(c) Deliver to Younghusband the *obligations of said Illinois corporation payable to Paul Rowatt*, and assigned in blank by him without recourse, in the amounts and on the dates stated below:

Dec. 15, 1947 _____ $330,000.00
Dec. 15, 1948 through Dec. 15, 1960 _____ 335,000.00

*which obligations shall be held by Younghusband as collateral security in substitution* for said 637½ shares of said Indiana corporation, pursuant to the provisions of an agreement relating to the purchase and sale thereof dated September 29, 1947, the proceeds of said obligations to be collected by Rowatt so long as he is not in default under the provisions of said agreement of September 29, 1947.

And the undersigned hereby agrees to account to Younghusband and be personally responsible for said shares of capital stock delivered on the giving of this trust receipt until the delivery of the obligations of said Illinois corporation as provided for herein.

Dated at Chicago, Illinois, September 30, 1947.

(S)  Paul Rowatt  (SEAL)
PAUL ROWATT

[Emphasis supplied.]

The other trust receipt which was delivered by Rowatt to Montenier was identical, except that it related to the 50 shares of stock of Dana (Indiana) sold by Montenier to Rowatt; and it called for delivery by Rowatt to Montenier of obligations of the new corporation, payable in amounts and on dates, as follows:

Dec. 15, 1947_____ $25, 000
Dec. 15, 1948, through Dec. 15, 1960_____ 30, 000

On September 30, 1947, Rowatt as the then sole stockholder of Dana (Indiana) caused said corporation to be dissolved under the laws of the State of Indiana. On this same day Rowatt surrendered to Dana (Indiana) for cancellation, all of that corporation's shares of outstanding capital stock; and also on this same day he received from said corporation in complete and final liquidation thereof, all of that corporation's assets, subject to its then outstanding liabilities. This distribution of assets in complete liquidation was effected by means of a document entitled "Bill of Sale and Assignment" which was executed by the corporation and Rowatt, and under which the distribution was made solely to Rowatt.

The balance sheet of Dana (Indiana) as of September 30, 1947, just prior to the above-mentioned distribution to Rowatt, was as follows:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash | $68, 818. 77 | Accounts payable | $185, 716. 76 |
| Notes and accounts receivable (net) | 292, 504. 83 | Due Consolidated Cosmetics | 886, 938. 30 |
| Inventories | 807, 204. 51 | Accrued expenses | 49, 653. 51 |
| Other assets | 93, 774. 70 | Other liabilities | 10, 000. 00 |
| | | Total liabilities | 1, 132, 308. 57 |
| | | CAPITAL | |
| | | Capital stock | $80, 000. 00 |
| | | Earned surplus | 49, 994. 24 |
| | | | 129, 994. 24 |
| Total assets | 1, 262, 302. 81 | Total liabilities and capital | 1, 262, 302. 81 |

On October 1, 1947, Rowatt caused the present petitioner corporation to be incorporated under the laws of the State of Illinois, under its original name of Dana Perfumes, Inc.[2] The period of the corporation's life was to extend, as provided in the charter, to December 31, 1960—which approximated the remaining life of the Dana license agreement that extended to November 7, 1960. Rowatt thereupon, on this same date of October 1, 1947, transferred and delivered to the petitioner corporation by means of an instrument designated "Bill of Sale and Assignment," all of the same assets previously owned by Dana (Indiana) including the Dana license, subject to the related liabilities, which he had just received in complete liquidation of the last-named Indiana corporation. And thereupon at this same time, the petitioner corporation delivered solely to Rowatt in exchange for such assets: 10,000 shares of its common stock of par value of $10 per share, being the only shares of its capital stock issued and outstanding; and two instruments executed by petitioner corporation in the form of installment promissory notes, made payable to Rowatt in the respective face amounts of $4,685,000 and $415,000 (total $5,100,000), which provided for installment payments extending to within 15 days of the expiration date of the petitioner's corporate life, as follows:

| Amount | Payable |
|---|---|
| $4,685,000 | $330,000 on Dec. 15, 1947; and $335,000 on Dec. 15 of each year from 1948 through 1960. |
| 415,000 | $25,000 on Dec. 15, 1947; and $30,000 on Dec. 15 of each year from 1948 through 1960. |

The larger of these two "promissory notes" read as follows:

DANA PERFUMES, INC., an Illinois corporation, does hereby certify that it is indebted, and hereby promises to pay to Paul Rowatt the sum of $4,685,000 payable in fourteen installments as follows: $330,000.00 on December 15, 1947, and $335,000.00 on December 15th of each and every year beginning in 1948 and ending in 1960, with interest after the date hereof at the rate of 2% per annum, payable annually, on December 15th, on the principal sum remaining from time to time unpaid, at the office of Paul Rowatt in Chicago, Illinois, or at such other place in Chicago, Illinois, as may be designated by the legal holder of this obligation, which was on the date hereof executed and delivered to Paul Rowatt in part payment for property this day transferred, assigned and conveyed by said Paul Rowatt to the undersigned.

Dated October 1, 1947.

DANA PERFUMES, INC.,

By (S)   J. L. Younghusband,

President.

Attest:
_____
Secretary.

---

[2] The name of the petitioner corporation was changed on July 1, 1957, to John Town, Inc., which it has at all times since continued to use.

The provisions of the other smaller "promissory note" were substantially identical with the provisions above quoted, except that the face amount and the amounts of the several installments thereof were as heretofore stated.

Rowatt, after receiving delivery of these two purported "promissory notes," endorsed the same so as to make them payable "to the order of Bearer, without recourse"; and he then delivered the instrument of larger amount to Younghusband, and the other instrument to Montenier, as substitute collateral (in lieu of the previously delivered stock of Dana (Indiana)) for his above mentioned obligations to these individuals under his stock purchase agreements with them.

Rowatt, as a means for providing further security to Younghusband in respect of his (Rowatt's) obligation under the above-mentioned stock purchase agreement, placed in escrow all the shares of petitioner corporation which had just been issued to him—under an arrangement whereby in the event that Rowatt died prior to December 15, 1960, Younghusband would become entitled to purchase these shares of stock from Rowatt's estate.

The following journal entry appearing on petitioner's books of account, reflects petitioner's receipt from Rowatt of the assets and assumption of the liabilities, that had formerly been owned and owed by Dana (Indiana):

| | | |
|---|---|---|
| Cash | $68,818.77 | |
| Accounts receivable | [1]310,046.68 | |
| Inventory—Packaging materials | 606,346.90 | |
| Work in process | 64,708.94 | |
| Finished goods | 134,498.45 | |
| Other purchases | 1,650.22 | |
| Advances for material purchases | 7,486.56 | |
| License agreements expiring Nov. 6, 1960 | 5,106,215.56 | |
| Reserve for bad debts | | $14,823.34 |
| Advances from Consolidated Cosmetics | | 886,938.30 |
| Accounts payable | | 185,716.76 |
| Reserve for returns | | 2,718.51 |
| Reserve for cooperative advertising | | 10,000.00 |
| Accrued withholding taxes | | 5,586.09 |
| Accrued personal property taxes | | 44.71 |
| Accrued excise taxes—State | | 43.09 |
| Accrued excise taxes—Federal | | 513.25 |
| Accrued royalties | | 43,466.37 |
| Paul Rowatt—vendor | | 5,200,000.00 |
| Paul Rowatt—vendor | 5,200,000.00 | |
| Notes payable | | 5,100,000.00 |
| Capital stock common subscription | | 100,000.00 |

[1] Said amount for accounts receivable is before adjustment for the reserve for bad debts and the reserve for returns, separately listed.

*Facts re Operations of Petitioner*

At all times after October 1, 1947, when petitioner acquired from Rowatt the assets and going business that formerly had been owned and operated by Dana (Indiana), and continuously until July 1, 1957, petitioner conducted the same going business and employed substantially the same assets as had Dana (Indiana). There were, however, two variations: (1) Petitioner, at all times thereafter, served as its own sole distributor of Tabu products under the Dana license, instead of having the Consolidated Cosmetics partnership serve as the sole distributor of such products as had been the situation during the time when Dana (Indiana) was the holder of such license; and (2) instead of the Consolidated Cosmetics partnership handling its own business as it had done prior to October 1, 1947, the partnership entered into an agreement with petitioner, under which petitioner was hired to operate the partnership business that Younghusband controlled.

Another significant fact is that immediately after petitioner was organized, it entered into a contract with Younghusband, under which the latter was elected president and treasurer and was also employed as general manager of the petitioner corporation, for a period coextensive with the entire authorized life of the corporation ending on December 31, 1960, and also approximately coextensive with the remaining term of the Dana license agreement ending on November 7, 1960. The provisions of this employment contract, so far as here material, were as follows:

WHEREAS, Rowatt, on September 29, 1947, acquired all the outstanding shares of the capital of Dana Perfumes, Inc., (Indiana), which possessed rights to market products bearing said trade names [Dana, Tabu and others], and caused the present Illinois corporation known as Dana Perfumes, Inc., to be incorporated to acquire from him the business enterprise previously conducted in the name of said Indiana corporation, and

WHEREAS, Rowatt considers it essential to continue the association of Younghusband with said business enterprise distributing products bearing said trade name and as a condition of Rowatt's acquisition of said shares of said Indiana corporation it was agreed Younghusband would continue to supervise and manage the sale and distribution of said products and refrain from competing therewith and hold and administer the offices of general manager, president and treasurer of Dana [the petitioner, Illinois corporation] so the trade will not be cognizant of any changes of proprietorship of said business enterprise, and

WHEREAS, Younghusband is willing to continue the management and operation of said business enterprise but only in the event he is allowed to have and exercise the full authority appertaining to the business of general manager of said business enterprise and, when elected, to the offices of president and treasurer of Dana [the petitioner, Illinois corporation] without undue and unreasonable restraint, and

WHEREAS, it is for the best interest of all the parties to this agreement that Younghusband continue to manage said business enterprise,

IT IS AGREED AS FOLLOWS:

1. Dana hereby hires Younghusband and Younghusband hereby agrees to work for Dana as general manager of the business engaged in by Dana and, when elected by its board of directors, to hold and administer the offices of president and treasurer of Dana and to perform the duties appertaining to said employment.

2. The term and duration of said employment shall continue until December 31, 1960 [a period coextensive with petitioner's authorized corporate life, and also approximately coextensive with the remaining term of the Dana license agreement which was to expire on Nov. 7, 1960] * * *

\* \* \* \* \* \* \*

4. Younghusband shall be paid compensation at the rate of $12,000. per year, plus 5% of Dana's net profits * * * before payment of federal taxes.

Petitioner's board of directors, acting in accordance with the foregoing contract, on October 1, 1947, elected Younghusband to the offices of president and treasurer, and also hired him as general manager; and the board at the same time elected Rowatt to the offices of vice president and assistant treasurer.

The principal asset formerly owned by Dana (Indiana) which petitioner acquired at the time of its organization, was the Dana license; and the fact that petitioner became the successor licensee under such license was specifically recognized by the licensor in an agreement with that licensor which was executed on August 30, 1948. The expiration date of the Dana license remained the same as it had always been— November 7, 1960, a date which approximately coincided with the date on which petitioner's corporate existence was to terminate under the terms of its charter, which was December 31, 1960.

The following table shows petitioner's net sales of products under the Dana license agreement; its cost of goods sold; its expenses for salaries (other than officers) and advertising; and its net profit (or loss) for each of its fiscal years ended September 30, 1948 through 1956—all as reported on its Federal income tax returns:

| Fiscal year ended Sept. 30— | Net sales | Cost of goods sold | Salaries expense | Advertising expense | Net profit (or loss) |
|---|---|---|---|---|---|
| 1948 | $3,623,253.08 | $1,238,587.65 | $414,942.00 | $581,229.41 | $114,374.25 |
| 1949 | 3,901,158.04 | 1,032,467.39 | 446,689.51 | 578,272.64 | 538,885.59 |
| 1950 | 4,962,375.82 | 1,263,187.25 | 390,822.87 | 559,615.97 | [1] 1,090,760.42 |
| 1951 | 3,871,222.41 | 1,034,549.16 | 389,499.23 | 611,406.77 | [2] 70,542.88 |
| 1952 | 3,878,271.98 | 1,205,621.62 | 350,321.88 | 533,588.83 | [3] (988,723.04) |
| 1953 | 3,454,406.31 | 957,651.55 | 319,182.69 | 590,102.19 | 275,818.56 |
| 1954 | 3,067,626.89 | 803,530.79 | 278,886.67 | 510,513.62 | 18,388.95 |
| 1955 | 2,998,525.80 | 798,158.30 | 257,445.85 | 428,185.08 | 278,396.48 |
| 1956 | 3,359,774.53 | 933,012.63 | 289,420.22 | 443,526.03 | 557,228.32 |

[1] On an amended return filed by petitioner for fiscal 1950, net income of $750,645.86 was reported. This lesser amount was due to an increase of certain deductions other than those listed in the table above.

[2] On an amended return filed by petitioner for fiscal 1951, net income of $382,107.96 was reported. This greater amount was due to certain income items and deductions, other than those listed in the above table.

[3] On an amended return filed by petitioner for fiscal 1952, a net *income* of $347,810.72 was reported. This change from the previously reported *loss*, resulted from a decrease in certain deductions other than those listed in the above table.

Despite the substantial earnings above shown, petitioner at no time throughout its corporate existence ever formally declared and paid any dividend.

In March 1951, the petitioner corporation paid to Rowatt the entire then remaining balance of the smaller "promissory note" above mentioned, which it had issued to Rowatt at the time of its organization in 1947. And Rowatt, upon receiving this amount which exceeded $200,000, then paid over all or substantially all of the same to Montenier in final and complete satisfaction of Rowatt's obligation to Montenier under their 1947 stock purchase agreement. The result of this was that Montenier was thereupon entirely eliminated from the present picture; and that he was at no time thereafter a participant in any subsequent transaction here involved.

### Facts re Subsequent Agreement of 1951

On December 21, 1950, which was more than 3 years after the petitioner corporation had taken over from Rowatt the going business and all net assets (including the Dana license) that formerly had been owned and operated by Dana (Indiana), the Internal Revenue Service notified Rowatt that it had determined that he was liable as a transferee of the assets of Dana (Indiana), for deficiencies in the latter's income and excess profits taxes (plus additions to tax and interest) for its fiscal years 1944 through 1947. The amount of such asserted transferee liability totaled more than $2,600,000.

Rowatt, upon being informed of this new development, told Younghusband that under the provisions of their previously mentioned 1947 stock purchase agreement, Younghusband was personally bound as an indemnitor to reimburse Rowatt for 79.68 percent of any such transferee liability for which Rowatt might be liable. Thereupon, following extended negotiations, a new agreement was executed on November 6, 1951, by Younghusband, Rowatt, the petitioner corporation, and the Consolidated Cosmetics partnership, under which certain modifications were made in the then existing arrangements among these contracting parties. The principal features of this new agreement (which was received in evidence as Exhibit 39–MM, and which covers nine typewritten legal-size pages) may be summarized in substance, as follows:

1. It was recognized by all of said contracting parties that Rowatt had in September 1947, purchased from Younghusband all of the latter's 637½ shares of capital stock of Dana (Indiana) at a specified price, of which the remaining unpaid balance of principal was $3,091,875; that shortly thereafter Rowatt in order to provide Younghusband with *collateral security for his obligation* for the unpaid balance of the purchase price of said stock, had endorsed and delivered to Younghusband the larger above-mentioned "promissory note" of the petitioner corporation in the face amount of $4,685,000; and that the then remaining balance of principal on petitioner's said "promissory note" which Younghusband still held as collateral security for

Rowatt's stock purchase obligation, was also the same identical amount of $3,091,875.

2. It was further recognized in this new 1951 agreement, that an offer in compromise settlement of the above-mentioned asserted transferee liability of Rowatt for income taxes of Dana (Indiana) for its fiscal years 1944 through 1947, had been submitted to the Internal Revenue Service; and the contracting parties thereupon agreed that if said offer of settlement were accepted by the Internal Revenue Service, then the petitioner corporation would pay and discharge the compromised amount of all income tax liabilities of Dana (Indiana) which had been asserted against Rowatt as transferee, together with interest thereon, for an aggregate amount not to exceed $1,050,000. (This sum apparently equaled the amount of the settlement offer which had been submitted to the Internal Revenue Service.) (*Note:* Subsequently in 1956, said tax liabilities of Dana (Indiana) were compromised and finally settled with the Internal Revenue Service; and thereupon the petitioner corporation paid the amount of said settlement, together with interest, in the total sum of $1,026,421.96.)

3. It was agreed that all of the petitioner's notes and accounts payable to Younghusband, and also a substantial portion of petitioner's accounts payable to the Consolidated Cosmetics partnership, would be merged into a single account payable from petitioner to Younghusband. (*Note:* About 3 weeks later when this merging of accounts was made effective, there actually was included in the new merged account as an additional item, the entire unpaid balance of $3,091,875 on the above-mentioned "promissory note" which petitioner had in 1947 delivered to Rowatt in partial exchange for his transfer to it of the assets and going business that previously had been owned and operated by Dana (Indiana). At all times thereafter, any payments made by petitioner in respect of said "promissory note" to Rowatt, were made directly to Younghusband, rather than to Rowatt.)

4. Younghusband agreed that, if and to the extent the petitioner corporation might be unable to meet "from its cash accumulated in the ordinary course of its business," its obligation under the above-mentioned "promissory note" to Rowatt (which Younghusband held as collateral security for Rowatt's stock purchase agreement), then Younghusband would in such circumstance extend the maturity dates of the related payments due to him from Rowatt under the latter's 1947 stock purchase agreement. Younghusband further agreed that, until the pending dispute with the Internal Revenue Service respecting the tax liabilities of Dana (Indiana) should be finally settled or otherwise terminated, all of Rowatt's payments to him in respect of Rowatt's said 1947 stock purchase agreement would be entirely suspended. And Younghusband further agreed that if Rowatt's obligation to him under said 1947 stock purchase agreement was not fully

satisfied prior to December 15, 1960 (which was shortly prior to the expiration date of the petitioner's corporate life), then Rowatt could fully discharge said stock purchase obligation by: (a) Assigning and delivering to Younghusband all of Rowatt's shares of stock in the petitioner corporation, and (b) disclaiming any further interest in the said "promissory note" of petitioner which Younghusband then held as collateral security for Rowatt's stock purchase obligation.

5. The previously mentioned escrow under which Younghusband held an option to purchase Rowatt's stock in the petitioner corporation was canceled; the shares were returned to Rowatt; and then, in lieu of said escrow arrangement, it was agreed that if Rowatt died prior to December 15, 1960, Younghusband would be entitled to buy from Rowatt's estate all of the decedent's shares of the petitioner corporation, for a price equal to the book value thereof.

6. Young husband resigned his positions as president, treasurer, and general manager of the petitioner corporation; and it was agreed that he would thereupon be reemployed by the petitioner corporation as its "merchandising and advertising counsel," at the same salary of $12,000 per year, plus an additional amount equal to 5 percent of petitioner's net profits per year before Federal income taxes.

7. Younghusband and Rowatt agreed that in certain specified circumstances, Younghusband might acquire some of Rowatt's shares of the petitioner corporation's stock. (Actually, in 1953 Younghusband did acquire 200 shares of such stock from Rowatt; and in 1954 he acquired an additional 120 shares.)

*Facts re Petitioner's Adoption of Plan of Complete Liquidation, Its Sale of Assets, and Its Distributions to Stockholders*

During the year 1956, the above-mentioned Javier Serra (who was one of the licensors under the above-mentioned Dana license agreement) approached Rowatt relative to the possibility of the petitioner corporation selling to a new corporation to be formed by Serra and his associates, substantially all of petitioner's operating assets (including the Dana license). After negotiations with respect to this matter, the following events here material, occurred.

1. On February 21, 1957, petitioner's board of directors adopted, and the stockholders on the same date approved, a plan for the dissolution and complete liquidation of the petitioner corporation; and for distribution to its stockholders in complete liquidation, within a 12-month period beginning on the date of the adoption of such plan, of all assets of the corporation except those necessary to be retained to meet claims.

2. Thereafter on July 1, 1957, the petitioner corporation (pursuant to action of its board of directors and with the consent of its stockholders) sold, assigned, and delivered to a newly organized Delaware

corporation named Dana Perfumes Corp., which was controlled by Serra and his associates, the Dana license for the price of $2,800,000, and all of petitioner's inventories for the price of $442,749.24 (being an aggregate sale price of $3,242,749.24). Under the terms of the contract of sale, said price for the inventories was to be paid in full by January 15, 1958; and the said price for the Dana license was to be paid in installments over a 5-year period, as follows: On January 15, 1958, and on each succeeding January 15 until 1963, $450,000 or 80 percent of Dana (Delaware) annual net profits before Federal income tax, whichever amount was greater.

Subsequently on January 30, 1958, petitioner distributed $300,000 to its shareholders pursuant to the plan of liquidation. However on January 31, 1958, which was approximately 11½ months after its adoption of the plan of complete liquidation on February 21, 1957, petitioner (as has been stipulated) continued to retain the following assets:

| | |
|---|---:|
| Cash | $708, 364. 96 |
| Government bonds | 2, 508, 855. 28 |
| Furniture and fixtures | 5, 226. 23 |
| Promissory note of Dana (Delaware)—unpaid balance (face amount) | 2, 344, 000. 00 |
| Total | 5, 566, 446. 47 |

These assets were retained, as shown by petitioner on brief, to provide for payment of the following:

| | | |
|---|---:|---:|
| Current liabilities (principally current income tax liabilities) | $204, 803. 24 | |
| Asserted income tax deficiencies for 1948–57, which were in controversy | 3, 041, 609. 50 | |
| Contingent liabilities and liquidating expenses | 503, 882. 80 | |
| Subtotal | | $3, 750, 295. 54 |
| Unpaid balance of petitioner's above-mentioned "promissory note" which had been delivered to Rowatt at the time of petitioner's incorporation in 1947, in partial exchange for the assets and going business formerly owned and operated by Dana (Indiana) | | 1, 816, 150. 93 |
| Total | | [3] 5, 566, 446. 47 |

[3] Respondent has agreed on brief, that the first three of said items totaling $3,750,295.54, represented "claims" against petitioner within the meaning of sec. 337(a)(2) of the 1954 Code, in respect of which assets could properly be retained beyond the 12-month period beginning with the adoption of the plan of complete liquidation, without petitioner losing the benefit of the nonrecognition-of-gain provision of said statute. Respondent disputes however, that the last item in the amount of $1.816,150.93, actually represents such a "claim"; and he contends to the contrary that this item represents, in substance as distinguished from its form, an equity capital investment of Rowatt at the time of petitioner's creation in 1947, against which petitioner *could not*, under sec. 1.337–2(b) of the Income Tax Regulations, retain assets beyond said 12-month period without losing the benefit of the nonrecognition-of-gain provision of said sec. 337(a) of the 1954 Code. This dispute is the nub of the controversy under the first issue here considered.

On February 21, 1958, the 12-month period beginning on the date of petitioner's adoption of its plan for complete liquidation expired; but at that time petitioner continued to hold substantially the same amounts of assets, and to have substantially the same items of alleged "claims," as above shown. And as of September 30, 1958 (which was more than 7 months after expiration of said 12-month period), petitioner still retained the following assets and had the following liabilities, as shown on Schedule L of its income tax return for its fiscal year ended on said date:

ASSETS

| | | |
|---|---|---|
| Cash | $398, 358. 33 | |
| Government bonds | 2, 702, 119. 15 | |
| Miscellaneous assets | 7, 710. 27 | |
| Promissory note of Dana (Delaware), unpaid balance | 2, 320, 000. 00 | |
| Total assets | | $5, 428, 187. 75 |

LIABILITIES

| | | |
|---|---|---|
| Accounts payable | $5, 000. 00 | |
| Other miscellaneous liabilities | 4, 354. 90 | |
| Unpaid balance of petitioner's above-mentioned "promissory note" delivered to Rowatt on incorporation in 1947 | 1, 816, 150. 93 | 1, 825, 505. 83 |
| Capital stock | | None |
| Earned surplus and undivided profits | | 3, 602, 681. 92 |
| Total liabilities and capital | | 5, 428, 187. 75 |

In about January 1960, petitioner paid directly to Younghusband the entire remaining balance of the above-mentioned "promissory note" that it had issued to Rowatt at the time of its incorporation in 1947, and which Younghusband was holding as collateral security for Rowatt's obligation to him on the previously mentioned 1947 stock purchase agreement.

On September 15, 1960, petitioner amended its charter so as to extend in perpetuity, its corporate life which theretofore was to expire, under the provisions of its charter, on December 31, 1960. At the time of the trial herein, petitioner still continued its existence; and it then held assets in the amount of about $200,000 to provide for any liability that might be established against it in the instant case.

---

In its income tax return for its fiscal year ended September 30, 1957, petitioner reported that it had during said year adopted a plan of complete liquidation, and had during said year sold certain of its assets to Dana (Delaware) at a net gain to it of $1,204,147.11; but it

treated said net gain as not being subject to income tax, by reason of the nonrecognition-of-gain provision of section 337(a) of the 1954 Code. The respondent however, in his notice of deficiency herein, determined that said net gain (as adjusted by respondent to an amount larger than that reported on the above-mentioned return) was recognizable under section 1002 of the 1954 Code (pertaining to gains from sale or exchange of property) ; and he denied the contention of petitioner as to the nonrecognition of such gain under section 337.

FINDINGS OF ULTIMATE FACTS

1. The two instruments in the form of "promissory notes" for amounts of $4,685,000 and $415,000, respectively, which the petitioner corporation upon its creation issued to Paul Rowatt in connection with his transfer to it of all the net assets and going business of the predecessor Dana (Indiana) corporation—did not represent a bona fide indebtedness of the petitioner corporation; but to the contrary, they represented *equity capital* invested at the risk of the business.

2. The same applies also to the unpaid balance of approximately $1,800,000 on one of said "promissory notes" which remained outstanding at the time of petitioner's adoption of its plan of complete liquidation in 1957, and against payment of which petitioner retained assets for more than 12 months after its adoption of the plan of complete liquidation.

3. Petitioner corporation did not meet the requirement of section 337(a) of the 1954 Code, pertaining to distribution within 12 months after adoption of a plan of complete liquidation of all assets except those retained to meet claims for indebtedness; and therefore it does not qualify for the benefit of the nonrecognition-of-gain provision of said statute.

OPINION

*I*

The *basic question* to be decided under issue 1 is: Whether two instruments in the form of long-term, nonnegotiable, and unsecured promissory notes of the petitioner corporation in the amounts of $4,685,000 and $415,000, respectively, which said corporation upon its creation issued to Paul Rowatt in connection with his transfer to it of all the net assets and going business of the predecessor Dana (Indiana) corporation—actually represented a bona fide *indebtedness* of the petitioner corporation; or whether to the contrary said instruments, in reality as distinguished from their form, represented *equity capital* invested at the risk of the business. The answer to this question will be determinative of whether or not the Commissioner correctly determined, in his notice of deficiency herein, that the petitioner corpo-

ration is *not* entitled to exclude from its gross income for the taxable year 1957 here involved, a net gain of approximately $1,600,000 (as determined by respondent) which it realized in said year from the sale of certain of its assets.

The reason why the answer to said basic question will be determinative of issue 1, is this. Section 337 of the 1954 Code provides, in here-pertinent part:

(a) GENERAL RULE.—If—
    (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
    (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,
then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

In this connection, section 1.337–2(b) of the Income Tax Regulations makes it clear that the phrase "assets retained to meet claims," as used in paragraph (2) of the above statute, is intended to mean a reasonable amount of assets which a corporation in liquidation may retain beyond the 12-month period mentioned in said statute, for the purpose of meeting claims of *indebtedness* (including known or contingent liabilities and liquidating expenses). But said section of the regulations also provides specifically, that "no amount [of assets] may be set aside to meet claims of stockholders with respect to their stock." Thus it follows from said statute and regulations, that if a corporation in liquidation retains assets after the expiration of said 12-month period, to meet a purported liability that does not actually represent a bona fide indebtedness, but which to the contrary represents in substance and reality *equity capital* invested at the risk of the business—then such corporation in liquidation will not be entitled to exclude from its gross income under said section 337(a) of said statute, any gain which it may have realized from sale of its assets within said 12-month period.

In the instant case, the petitioner corporation (as we have hereinabove found as a fact) did retain beyond the 12-month period beginning with the date of its adoption of the plan for complete liquidation, approximately $5,500,000 of its assets for the purpose of meeting the following alleged "claims": (1) Approximately $3,750,000, representing various known or contingent liabilities and liquidating expenses, including disputed deficiencies in income taxes; and also (2) approximately $1,800,000, representing the unpaid balance of principal on one of the two above-mentioned "promissory

notes"[4] that it had delivered to Rowatt at the time of its creation in connection with his transfer to it of all the net assets and going business of the predecessor Dana (Indiana) corporation.

The respondent has conceded herein, that the first group of above-listed liabilities totaling approximately $3,750,000, does represent true "claims" for *indebtedness* and liquidation expenses, within the meaning of said section 337(a) of the statute; and accordingly that petitioner was entitled to retain assets beyond the above-mentioned 12-month period in order to meet the same. However, as regards the other above-listed item of approximately $1,800,000 pertaining to the "promissory note" which petitioner issued to Rowatt at the time of its incorporation, respondent's position is that this item *does not* represent bona fide *indebtedness* of petitioner but to the contrary represents an *equity capital investment;* and respondent therefore contends that when petitioner retained assets to meet this item, for more than said 12-month period, it thereby lost the benefit of the nonrecognition-of-gain provision of section 337(a) of the 1954 Code.

It is this position of the respondent, with which the petitioner does not agree, that has given rise to the above-stated *basic question* which will be determinative of issue 1.

## *II*

The question as to whether a particular instrument that in form purports to evidence a corporate indebtedness, actually represents an *equity capital investment*, is a familiar one. Essentially, it is a question of fact upon which the taxpayer has the burden of proof. *2554–58 Creston Corp.*, 40 T.C. 932, 935; *Arlington Park Jockey Club, Inc.* v. *Sauber*, 262 F. 2d 902, 905 (C.A. 7); *Charter Wire, Inc.* v. *United States*, 309 F. 2d 878, 880 (C.A. 7); *Matthiessen* v. *Commissioner*, 194 F. 2d 659, 661 (C.A. 2); and *O. H. Kruse Grain & Milling Co.* v. *Commissioner*, 279 F. 2d 123, 125 (C. A. 9). There is no magic formula that provides the solution. Rather, in each case wherein such question arises, all facts established by the evidence must be considered and weighed; and the comparative emphasis or weight to be accorded to each fact or factor that is regarded to be important to the solution, depends upon its relation to all other facts and factors, as a whole.

Various tests or criteria, several of which are hereafter considered, have from time to time been suggested by courts as being pertinent to the inquiry whether an alleged indebtedness is, in fact, an investment of equity capital. See, e.g., *Arlington Park Jockey Club, Inc.* v. *Sauber, supra* at 905–906; *Gilbert* v. *Commissioner*, 248 F. 2d 399, 402–406

---

[4] As hereinabove found as a fact, the smaller of said two "promissory notes" which petitioner had delivered to Rowatt at the time of its incorporation, was fully paid by the petitioner in March 1951, and thus was not outstanding in the taxable year 1957 here involved.

(C.A. 2) ; *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39, 46–47 (C.A. 2) ; *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 59, affd. 254 F. 2d 51 (C.A. 7) ; and *2554–58 Creston Corp., supra* at 936. But the applicability of any such suggested test depends again upon the facts and circumstances of the particular case at hand; and thus the decision reached in any one case may be of little or no aid in finding the correct solution for another case that presents a different factual situation.

In the instant case, after considering and weighing all facts established by the evidence and also after applying all suggested tests that we believed to be here applicable, we have found as an ultimate fact, and we here hold: That the two above-mentioned instruments in the form of "promissory notes" of the petitioner corporation for the amounts of $4,685,000 and $415,000, respectively, which the petitioner issued to Paul Rowatt at the time of its creation—represented in substance and reality as distinguished from their form, *equity capital* invested at the risk of the business, and not bona fide indebtedness. And we have further found as an ultimate fact, and we here hold, that the same is true also of the unpaid balance of approximately $1,800,000 on the larger of these "promissory notes," which remained outstanding at the time of petitioner's adoption of its plan of complete liquidation, and against payment of which petitioner retained assets for more than 12 months after its adoption of said plan.

Among the several facts, factors, and tests which we have considered to be significant in reaching our said findings of ultimate facts and holdings, are the following:

1. After considering and weighing all the evidence herein, we are convinced that the *primary purpose* of the plan leading to the organization of the petitioner corporation, which Younghusband and Rowatt agreed upon in September 1947 and which they and Montenier thereupon put into effect, was *not* to provide a method through which Younghusband might terminate both his financial investment and his managerial responsibilities in the business of operating under the Dana license; but rather, that such *primary purpose* was to provide a method through which Younghusband, Rowatt, and Montenier, by using a series of executory contracts that neither effected any withdrawal of their capital in the business nor necessitated any additional capital to be invested by them, would enable the new petitioner corporation to at least claim a very substantial stepped-up basis for computing amortization deductions in respect of the Dana license; and which would at the same time enable Younghusband to continue his participation in the business, by becoming the president, treasurer and general manager of the successor corporation (being the same positions which he had held for several years in the predecessor Indiana corporation). Also we are further convinced that the *pri-*

*mary purpose* of having the new petitioner corporation issue the $5,100,000 of promissory notes to Rowatt, *was not* to enable the new corporation to acquire any capital or asset that it would not otherwise have acquired if stock alone had been issued to Rowatt in exchange for the assets and going business which the Indiana corporation had previously operated; but rather, that such *primary purpose* for the issuance of said "promissory notes" was to provide Rowatt with a means for withdrawing earnings and profits from the new Illinois corporation without dividend consequences, so that he could use most of these withdrawals to satisfy his large personal obligations to Younghusband and Montenier under the executory stock purchase agreements with them.

The manner in which said overall plan of Younghusband and Rowatt was designed to operate was this. Younghusband and Montenier first sold all their shares of stock in the Indiana corporation to Rowatt for an aggregate price of $4,468,750 (a figure which these parties agreed upon without resort to any appraisal of either the stock or the corporate assets) ; and Rowatt then acting as sole stockholder of the Indiana corporation, liquidated that corporation and personally acquired all its assets through a distribution to him in complete liquidation. By means of these steps, which were all essential to the overall plan, Rowatt was enabled to make claim to a stepped-up basis for the assets which he had so acquired through liquidation of the Indiana corporation—being a basis equal to the face amount of his executory stock purchase agreements (i.e., $4,468,750) plus the cost of his individually held shares—as distinguished from the cost basis of the predecessor Indiana corporation which was only $32,000 to $36,000. And following the foregoing, Rowatt transferred the same assets and going business to the new petitioner corporation in exchange for stock and the "promissory notes" here involved—thereby permitting the new corporation to at least claim a stepped-up basis of $5,100,000 for the Dana license which was the principal asset so transferred.

The "promissory notes" here involved were executed on behalf of petitioner by Younghusband in his capacity of president; and following this, he and Montenier took possession of these notes as "collateral security" for Rowatt's obligations to them under the above-mentioned stock purchase agreements. In the years following, no dividend was ever declared and paid by the petitioner corporation; but during said years, most of the earnings and profits which petitioner derived from its operation of the Dana license, were paid out to Rowatt under the "promissory notes," and most of these payments were then turned over by Rowatt to Younghusband and Montenier in satisfaction of his obligations to them under the stock purchase agreements.

Subsequently, Younghusband agreed with Rowatt that if and to the extent that the petitioner corporation might be unable to make the specified payments on the notes "from its cash accumulated in the ordinary course of its business," then Rowatt would be excused during such period from making any payments to Younghusband under the stock purchase agreement. Such arrangement not only reflects the close relationship between the stock purchase payments and the note payments, but it also reflects the fact that the notes were not to be paid in accordance with their terms and in any event, but only out of petitioner's accumulated earnings and profits to the extent that these were available.

We regard all of the foregoing facts and circumstances to be significant in determining whether the "promissory notes" actually did represent bona fide indebtedness.

2. The notes were all issued to Rowatt alone; and Rowatt concurrently, and as the result of his transfer of the net assets and going business which he had acquired from the Indiana corporation, became the sole stockholder of petitioner. These facts in themselves raise a strong inference that both of these two classes of securities which Rowatt thus received, evidenced an equity investment—for all of the assets so transferred to the petitioner were essential for it to commence business and to remain in business. *Charter Wire, Inc.* v. *United States, supra* at 880. To the same effect, see *Arlington Park Jockey Club, Inc.* v. *Sauber, supra* at 906; *O. H. Kruse Grain & Milling Co.* v. *Commissioner, supra* at 126.

3. The notes represented an investment by Rowatt which was placed *at the risk of the business* of petitioner. The Dana license (for which the notes were purportedly issued) was the principal asset upon which the petitioner relied for the production of its earnings and profits; and unless these profits were realized, the large annual payments to be made to Rowatt on the notes could not be met. Thus Rowatt's dependency upon the *chances of profit*, tends to indicate in itself a capital investment on his part. See *Gilbert* v. *Commissioner, supra* at 406. In *United States* v. *Title Guarantee & Trust Co.*, 133 F. 2d 990, 993, the Court of Appeals for the Sixth Circuit said:

> The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * *

To the same effect, see *Commissioner* v. *Meridian & Thirteenth R. Co.*, 132 F. 2d 182, 186 (C.A. 7); *Arlington Park Jockey Club, Inc.* v. *Sauber, supra* at 906.

4. The notes, if they are deemed to reflect indebtedness, would cause the petitioner to have an exceedingly "thin capitalization," represented by $5,100,000 debt and only $100,000 capital stock—being a ratio of 51 to 1. This factor, while not conclusive, provides one of the significant suggested tests to be taken into account. See *Montclair, Inc.* v. *Commissioner*, 318 F. 2d 38, 40 (C.A. 5); *Nassau Lens Co.* v. *Commissioner, supra* at 47; *2554–58 Creston Corp., supra* at 936–937.

5. In our opinion, the "promissory notes" would not have been acceptable to an "outside investor." Notwithstanding that the total amount thereof ($5,100,000) was large for the particular business here involved, they were wholly unsecured by any mortgage, sinking fund, or collateral; they were for a long term (approximately 13½ years) extending over the entire corporate life of the petitioner; they were nonnegotiable; [5] they provided interest at only 2 percent per annum; and their payments were at the risk of a perfume business whose success depended upon large expenditures for advertising (as required by the license agreement) and was subject to the changing fancies of users of its products.

6. The form of instruments and transactions, though of some evidential value, is not conclusive as to their true character; for the important consideration is not the formalities in which parties cast their transactions, but rather the substance thereof. See *Griffiths* v. *Helvering*, 308 U.S. 355; *Emanuel N. (Manny) Kolkey, supra* at 58. The same is true of bookkeeping entries. *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179. Also, as was pointed out in *Gilbert* v. *Commissioner, supra* at 403, the following language in *Bazley* v. *Commissioner*, 331 U.S. 737, 741, is here applicable: "the form of a transaction as reflected by correct corporate accounting opens questions as to the proper application of a taxing statute; it does not close them."

### III

Petitioner has contended in substance, that this Court *should disregard*, as being mere "intermediate steps": (a) Rowatt's purchase from Younghusband and Montenier of all their shares of stock in the predecessor Dana (Indiana) Corp., through use of the stock purchase agreements above mentioned; (b) Rowatt's dissolution and liquidation of said predecessor, as the sole stockholder thereof; (c) Rowatt's acquisition, through the distribution in liquidation of said predecessor corporation to him alone, of all the net assets and going business of said predecessor; and (d) Rowatt's action in personally

---

[5] Britton, Bills and Notes (2d ed. 1961) states at p. 22: "An instrument to be negotiable must contain words of negotiability. The terms usually employed are the words 'or order' or 'bearer,' though words of similar import may be used [citing sec. 1(4) of N.I.L.]."

transferring all of said net assets and going business to the newly organized petitioner corporation, in exchange for certain shares of stock and the $5,100,000 of "promissory notes" here involved. And petitioner has further contended in substance, that this Court should conclude: That the newly organized petitioner corporation *purchased* the net assets and going business of its predecessor, *from the three shareholders thereof* (i.e., from Younghusband, Montenier and Rowatt); and that petitioner thereby became "liable to the selling shareholders (Younghusband, Montenier and Rowatt) for the purchase price." In support of these contentions, petitioner has cited several cases, including the following upon which it appears to have principally relied: *Kimbell-Diamond Milling Co.*, 14 T.C. 74, affd. 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827; *Koppers Coal Co.*, 6 T.C. 1209; *Estate of James F. Suter*, 29 T.C. 244; and *Henning Corporation*, T.C. Memo. 1960–90.

We do not agree with, and we therefore have rejected, these contentions of the petitioner for the following reasons:

First: In the instant case, we are considering an issue which is wholly different from the issues presented and decided (as hereinafter shown) in the cases upon which petitioner has relied. The present issue is whether the "promissory notes" here involved represent a bona fide *indebtedness to creditors*, or *equity capital* invested at the risk of the continuing business of operating the Dana license. Such issue, as we have hereinbefore shown, is essentially a question of fact upon which the petitioner has the burden of proof; and in resolving the same, this Court, as the finder of the facts, has found it necessary to consider and weigh *all* the evidence pertinent to such issue, including: (a) The circumstances, purpose, and nature of the transactions between Younghusband, Montenier, and Rowatt, which gave rise to the issuance of said "promissory notes"; (b) the identity of the particular person who actually acquired all the net assets and going business of the predecessor Indiana corporation, by first buying the stock of said predecessor and then liquidating it in an attempt to obtain a stepped-up *cost basis* for the Dana license (under the rule of the *Kimbell-Diamond Milling Co.* case, which petitioner has cited and which we shall hereafter discuss); (c) the identity of the particular person to whom the petitioner corporation actually issued said notes; and (d) the manner in which Younghusband, notwithstanding his sale to Rowatt of all his stock in the Indiana corporation, effected an arrangement under which he retained the major operating position in the continued exploitation of the Dana license, and also was enabled to enjoy the principal benefits of the claimed stepped-up basis for amortization of said Dana license, by becoming the indirect recipient of most of the dividend-free payments made under the "promissory notes" here involved.

Secondly: The "in-substance" factual picture which the petitioner contends this Court should adopt in its consideration of the present issue, is unsupported and contrary to the evidence of record; and such adoption would not clarify, but to the contrary would distort, the realities of the true factual picture established by the evidence herein.

The evidence in this case consists of two lengthy stipulations of fact, 153 jointly agreed exhibits, and the testimony of Rowatt as the sole witness. We have reviewed this evidence at considerable length in our findings of fact; and the same will not support petitioner's contention that the transactions leading up to the issuance of the "promissory notes" involved, amounted merely to a *purchase by the petitioner* of Dana (Indiana) assets and going business, from Younghusband, Montenier, and Rowatt as the three stockholders of said predecessor.

Third: The cases cited by petitioner in support of its said contention, are all distinguishable on the basis of the issues and facts involved in those cases. This is shown by the following summary of the cases upon which petitioner appears to have principally relied:

*Kimbell-Diamond Milling Co., supra,* involved a situation wherein the taxpayer, which was an established flour milling company, had its mill destroyed by fire; and where, in order for it to replace that facility, it purchased the stock of another company which had a suitable mill, and then liquidated the same as a means for acquiring the mill. The issue involved was the *cost basis* of the new mill; and this Court's decision, which was affirmed on appeal, was that such *cost basis* should be deemed equal to the price that the taxpayer had paid for the stock which it used in acquiring the mill. Said price was paid wholly *in cash*. No issue was presented or decided regarding the character of any "notes" issued by anyone.

It should be noted that this Court held, in *John Simmons Co.,* 25 T.C. 635, 641, that the principle of the said *Kimbell-Diamond* case (i.e., treating the cost of the stock as being the *cost basis* of the particular asset acquired) "was intended to be and should be limited to the peculiar situations disclosed by the facts" in that and certain other specified similar cases (which similar cases include several upon which the present petitioner is here relying for support of its above-mentioned contentions).

In *Koppers Coal Co., supra,* a corporation acquired for a *cash consideration* of $7,600,000, all the capital stock of six other mining companies; liquidated these six companies to acquire their assets; and then transferred said assets to a subsidiary which was newly organized to hold and operate the same. The issue for decision was the *cost basis* for the assets so acquired; and no issue was either presented or decided regarding the true character of any "promissory notes." This is another of the cases mentioned in the *Simmons* case, which this Court therein stated should be limited to its peculiar factual situation.

The *Suter* case involved a situation in which three individuals who were engaged in the paper business acquired a certain paper mill, by first buying the stock of, and then liquidating, the corporation which owned said mill. The consideration for their purchase of the stock consisted of partly cash, and partly promissory notes of said individuals. The buyers then organized a new corporation to operate the mill; and this corporation thereupon *assumed the notes of the individuals*, and also issued certain notes of its own to compensate the individuals for their cash outlays. Here again the issue presented and decided was the *cost basis* of the mill so acquired; and this Court decided that such *cost basis* should be deemed to be equal to the cost of the stock of the predecessor which had been acquired as a means for acquiring the mill. Another issue was whether the individuals received a dividend when the corporation *assumed* their liabilities for the purchase price of the stock; and the Court held that they did not. No issue was presented or decided regarding whether any of the notes issued or assumed in acquiring the assets, represented equity capital.

Similarly in *Henning Corporation, supra*, the principal issue for decision was the *cost basis* of certain depreciable assets to an acquiring corporation. There, an individual had first bought the stock of another corporation which owned said assets; had liquidated that corporation; and had then delivered most of the assets so acquired to the taxpayer corporation in exchange for all its shares of its *stock*, plus its assumption of liabilities. In such situation, this Court held that the *cost* of the assets to the taxpayer corporation was the fair market value of the *stock which it issued*, plus the amount of *liabilities which it assumed*.

It is true that in each of the foregoing cases, this Court, in determining the *cost basis* for the particular properties involved, did disregard certain preliminary transactions. But none of these cases, in our opinion, was intended to establish, or did establish, any *rule of law* which *requires* a court that is dealing with a wholly different issue (such as the issue presented in the instant case) to disregard any particular facts, factors, or circumstances that are necessary to its solution of the issue before it. Accordingly, we have based our findings of fact and holdings in the instant case, upon our consideration and weighing of *all the evidence* herein, in order to determine the realities of the complicated factual situation before us.

---

Based on all the foregoing, we decide the first issue in favor of the respondent; and we approve the respondent's determination that petitioner is not entitled to exclude from its gross income under section 337(a) of the 1954 Code, the gain which it realized from sale of assets after the adoption of its plan of complete liquidation.

*Issue 2. Deductibility of Depreciation or Amortization of Dana License, for the Year of Its Sale*

Petitioner corporation acquired the Dana perfume license at the time of its incorporation on October 1, 1947. On that date the license, which under its terms was to expire on November 7, 1960, had a remaining life of about 13 years and 1 month; and it was obvious that if petitioner continued to use the license in its business until the end of said period, the license would then expire and have no salvage value.

Petitioner, in its various Federal income tax returns, depreciated or amortized the license in accordance with said remaining life and said anticipated zero salvage value. And the parties hereto have agreed in paragraph 50 to the stipulation of facts, that petitioner's adjusted basis for said Dana license on October 1, 1956 (being the beginning of its fiscal year ended Sept. 30, 1957, here involved), was $1,123,566.84.

On July 1, 1957 (as we have hereinabove found in our findings of fact for issue 1) the petitioner sold the Dana license to Dana Perfumes Corp. for $2,800,000—which amount was in excess of its above-stated adjusted basis for the license as of October 1, 1956 (which was the beginning of its taxable year ended on Sept. 30, 1957, in which said sale was made).

In its income tax return for its fiscal year ended September 30, 1957 (being the year of the sale), petitioner deducted amortization on the Dana license, in the amount of $357,116.40. The respondent however, in his notice of deficiency herein, denied such deduction. The parties herein have now agreed in paragraph 82 of their stipulation of facts, that if this Court decides that petitioner is entitled to a deduction for amortization of the Dana license for its fiscal year ended September 30, 1957 (being the year of its sale), then the amount of such deduction will be $206,369.43.

The question to be here decided is whether, as a matter of law, the sale of a depreciable or amortizable asset by a taxpayer (such as the petitioner herein) for an amount in excess of its adjusted basis at the beginning of the year of sale, bars deduction of depreciation or amortization for that year.

The Supreme Court, in *Fribourg Navigation Co.* v. *Commissioner*, 383 U.S. 272 considered this question, and held that the taxpayer therein was entitled to the deduction.

The question here before us is, in our opinion, indistinguishable from that decided in the *Fribourg* case. Accordingly, on the authority of said case we decide the present issue in favor of the petitioner.

*Decision will be entered under Rule 50.*